[Civ. No. 11163. Fourth Dist., Div. One. Aug. 30, 1972.]

LOUIS C. HUTCHISON et al., Plaintiffs and Appellants, v. SOUTHERN CALIFORNIA FIRST NATIONAL BANK, Defendant and Respondent.

## COUNSEL

Mitchell, Schmidt & D'Amico and Donald W. Schmidt for Plaintiffs and Appellants.

Procopio, Cory, Hargreaves & Savitch, Richard B. Munks and Gerald E. Olson for Defendant and Respondent.

## OPINION

COUGHLIN, J.*—Plaintiffs appeal from a judgment dismissing their action for damages and declaratory relief based on an order sustaining defendant's general and special demurrers to their second amended complaint without leave to amend.[1] Plaintiffs contend the order sustaining defendant's demurrers was error. Determinative of the appeal is our conclusion the order sustaining the general demurrer without leave to amend was proper. ▉ "A demurrer admits all material and issuable facts properly pleaded . . . . However, it does not admit contentions, deductions or conclusions of fact or law alleged . . . ." (*Daar* v. *Yellow Cab Co.,*

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Defendant demurred generally and specially to the original complaint; plaintiffs thereupon filed a first amended complaint; defendant demurred generally and specially; the court sustained with leave to amend; and plaintiffs then filed their second amended complaint.

67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) We state the facts in the case accordingly.[2]

Plaintiffs, Mr. and Mrs. Hutchison, are referred to as Hutchison and plaintiffs Mr. and Mrs. Reese as Reese.

On July 30, 1969, Hutchison executed a "general pledge"[3] with defendant pursuant to which they, as pledgors, delivered to defendant, as pledgee, 19,486 shares of Kentucky Fried Chicken stock, hereinafter referred to as K.F.C. stock, to secure payment of $485,000 loaned them by defendant. On October 14, 1969, Reese executed a "general pledge" agreement pursuant to which they, as pledgors, delivered to defendant, as pledgee, 20,212 shares of K.F.C. stock to secure payment of $487,000 loaned them by defendant. The total shares pledged under both agreements was 39,698; and the total of the loans to both plaintiffs was $972,000. At the time pledged the K.F.C. stock "was selling for about $44 per share and had a market value in excess of $1,746,000."

The loans also were secured by a pledge of 339,000 shares of Food Baron Corporation stock, pursuant to an "ADDITIONAL AND CUMULATIVE GENERAL PLEDGE AGREEMENT," executed by plaintiffs on May 12, 1970; 214,000 shares thereof being registered in the name of Mr. Hutchison, and 125,000 shares thereof being registered in the name of Mr. Reese. At the time pledged, the Food Baron stock "had a value in excess of $400,000."

In 1969, and continuing to the date of the filing the second amended complaint, i.e., March 12, 1971, the stock market declined steadily. In "early March 1970" K.F.C. stock was being traded for $37.75 per share and plaintiffs were concerned its value would fall below this price; contacted Blair & Co., a stock brokerage firm, seeking advice on ways to protect their investment; and "were advised by a registered representative" of this firm he could arrange a transaction involving the pledged K.F.C. stock which would result in raising $840,000 and "was predicated on the concept the Bank [defendant] would either have in its possession or control the shares of stock or the money to apply against the debt." The proposed transaction was in two parts, each involving a separate bloc of the pledged K.F.C. stock approximating 20,000 shares. The first part was to sell call options to buy "approximately 20,000 shares of *plaintiffs'* Kentucky Fried Chicken stock"; [Italics ours] the purchasers of the options to be persons or entities "located by Blair & Co."; the options to be sold for $5 per

---

[2]The statement of facts in this opinion is premised on allegations contained somewhere in the second amended complaint without regard to its mechanical division into several separately stated alleged causes of action.

[3]Quotations in the statement of facts are from the second amended complaint.

share; the purchase price of the stock to be $37 per share; the period of the options to be six months and ten days;[4] and the proceeds of the sale of the options, i.e., $100,000, to be placed in defendant's account. The second part of the proposal was "to sell short against the box approximately 20,000 shares of K.F.C. stock at $37.00 per share"; and the money received from the sale, totaling approximately $740,000 to be placed in defendant's account.

Thereupon, the date not being alleged but by inference appearing to be sometime "in early March 1970," plaintiffs advised defendant of "their knowledgeable opinion that K.F.C. stock would decline sharply"; "disclosed" to defendant all information concerning the proposed transaction; and "suggested" defendant contact Blair & Co. or plaintiff would have Blair & Co. contact defendant if defendant desired further details.

Defendant refused to contact Blair & Co. or to allow plaintiffs to have Blair & Co. contact it; made no investigation in the premises; but, instead, "arbitrarily, unreasonably and negligently refused to permit the proposed transaction to be consummated." Although there is no allegation plaintiffs requested defendant's consent to the proposed transaction, from the facts alleged it may be inferred a request was made. ■ On demurrer the inferred fact is deemed true. (*People* ex rel. *Lynch* v. *San Diego Unified School Dist.*, 19 Cal.App.3d 252, 257 [96 Cal.Rptr. 658].)

The second amended complaint also contains the following conclusion of law: Defendant's "negligent refusal constituted a breach of its duty to plaintiffs, under Sec. 9-207 of the Commercial Code, to take prudent action to preserve the collateral which have ·[*sic*] been entrusted to it." Although, as heretofore noted, the allegation of a conclusion of law is not accepted as true, in the case at bench it indicates the legal theory upon which plaintiffs premised their complaint.

The pledge agreements contained the following provision: "Debtors [plaintiffs] shall not sell, contract to sell or otherwise transfer or encumber the Collateral or any interest therein without the written consent of Bank [defendant]."

Nine trading days after plaintiffs advised defendant of their fears concerning the decline in the value of K.F.C. stock and "made said request" the decline commenced; by April 23, 1970 "K.F.C. stock had fallen to $20.25"; and on September 18, 1970 "was selling for $14 per share."

---

[4]At oral argument in the trial court plaintiffs conceded the period of the options would be six months and ten days, which was the period alleged in the first amended complaint.

Thereupon, plaintiffs advised defendant "that, in their informed judgment, KFC stock had bottomed out and was due to increase in price in the very near future." It should be noted, the foregoing allegation relates only the plantiffs' *advice* to defendant respecting their opinion; there is no allegation K.F.C. stock in fact had bottomed out and was due to increase in price in the very near future. "By September 30, 1970, the price . . . had increased to $20 per share." On the latter date defendant advised plaintiffs it "ascribed no value whatsoever" to the Food Baron stock pledged under the agreement of May 12, 1970, as further security for plaintiffs' loans. Thereupon, plaintiffs requested defendant to release said stock with the understanding it would be sold or pledged and the proceeds applied against their indebtedness. "Said request was arbitrarily and negligently denied." There is no allegation the Food Baron stock could have been sold or pledged, or what amount could have been realized by such a sale or pledge.

Beginning on October 5, 1970 "without seeking the advice of persons with expert knowledge in the securities business," defendant "proceeded to sell said KFC stock in a careless and reckless manner by dumping large blocs thereof on the market at a distress price which terminated the probability of any further rally for KFC stock." Defendant sold the K.F.C. stock for "a total of approximately $700,000."

The second amended complaint contains 10 separately stated causes of action premised on theories of law summarily described by plaintiffs in captions thereto as "Negligence"; "Breach of Contract"; "Breach of Fiduciary Duty and Fraud"; "Intentional Fraudulent Inducement"; "Negligent Fraudulent Inducement"; "Intentional Interference with Advantageous Business Relations," and "Declaratory Relief." Each cause of action relies on the facts heretofore stated; eight thereof upon the contention defendant was under a duty to preserve the value of the pledged shares of K.F.C. stock which it violated by refusing to consent to the transaction proposed by Blair & Co.; one thereof upon the contention defendant violated its duty to act in good faith and in a commercially reasonable manner in selling the pledged K.F.C. shares of stock; and the declaratory relief cause of action upon the contention the pledge agreements, and designated provisions thereof, are invalid because they waive defendant's obligation to "insure, process and preserve the pledged Collateral," in violation of law.

▉ Initially it should be noted, basic to the statement of a cause of action for damages premised on wrongful or negligent conduct is a showing the charged conduct caused the claimed damages. (*Petersen* v. *Lewis*, 2 Cal.2d 569, 572 [42 P.2d 311]; *Puckhaber* v. *Southern Pacific Co.*, 132

Cal. 363, 364 [64 P. 480]; *Montijo* v. *Western Greyhound Lines,* 219 Cal.App.2d 342, 346 [33 Cal.Rptr. 184]; *Marvin* v. *Talbott,* 216 Cal. App.2d 383, 385, 387 [30 Cal.Rptr. 893, 5 A.L.R.3d 908].)

 The only allegations of causation and damage in the various causes of action are (1) as a "direct result" of defendant's breach of its duty to preserve the collateral which had been entrusted to it, i.e., defendant's refusal to consent to the transaction proposed by Blair & Co., and its failure to employ "a knowledgeable person in the securities field who was assigned the duty of preserving pledged stock," plaintiffs were damaged in an amount more than $440,000; (2) if defendant "had acceded to plaintiffs' request to sell or pledge said Food Baron stock" the sale of their K.F.C. shares of stock would not have been necessary, and as a "direct result *of the sale* of KFC stock" [Italics ours] plaintiffs were damaged in the sum of $800,000 being the difference between the value of their K.F.C. shares of stock "which, in a normal market, would be worth $1,500,000," and the amount for which the stock was sold, i.e., approximately $700,000; and (3) as a direct result of the sale of the K.F.C. shares of stock by defendant "in a careless and reckless manner by dumping large blocs thereof on the market at a distress price" plaintiffs were damaged in the sum of $800,000, being the difference between the worth of the shares of stock on a "normal market" and the amount for which they were sold. There is no allegation when, if ever, the market would be normal.

The second amended complaint, interpreted most favorably in support of plaintiffs' case, alleges only a proposed transaction to sell call options to purchase 20,000 shares of K.F.C. stock, and to sell short against the box an additional 20,000 shares. It does not allege (1) the proposed transaction could be consummated or would have been consummated if defendant had consented; (2) the call options could be sold for $5 a share, as proposed, or would have been sold if defendant had consented, or the time within which such sales would have been effected; or (3) the sales of shares against the box for $37 per share could be made or would have been made if defendant had consented, or the time within which such sales would have been made. Viewing the facts pleaded, as a whole, there is no showing defendant's refusal to consent to the proposed transaction caused plaintiffs' claimed damages (cf. *Campbell* v. *Rayburn,* 129 Cal. App.2d 232, 234-235 [276 P.2d 671]). The circumstances of the case required a showing of the chain of causation between defendant's refusal to consent and plaintiffs' claimed damages. Refusal to consent to the proposed transaction, unless it could be consummated, or refusal to release the Food Baron shares of stock, unless they could be sold or pledged as proposed, would not have caused plaintiffs' claimed damages. There was

no duty on defendant to employ a person knowledgeable in the securities field. The lack of adequate allegations of causation between defendant's conduct and plaintiffs' claimed damages is a fatal omission supporting the order sustaining the general demurrer.

■ Another readily apparent defect in the second amended complaint is the failure to segregate the damage Hutchison allegedly sustained from the damage Reese allegedly sustained. Hutchison owned approximately 20,000 shares of K.F.C. stock and Reese owned in excess of 20,000 shares. The total shares pledged were not owned jointly. The dual proposal to sell call options involved "approximately" 20,000 shares and to sell short against the box an additional 20,000 shares, but did not specify whose shares would be subject to the call options and whose shares would be subject to the sales against the box. Hutchison could claim damage allegedly caused by defendant's refusal to consent to the call options' proposal, or by defendant's refusal to consent to the sales against the box proposal, only if and to the extent their shares were the subject matter of these proposals. The same conclusion applies to Reese. Under the circumstances it is impossible to ascertain whether Hutchison or Reese sustained the damage on account of defendant's refusal to consent to either proposal.

There are other reasons for sustaining the general demurrer without leave to amend.

Essential to the causes of action seeking damages allegedly resulting from defendant's refusal to consent to the proposed transaction to sell call options and shares of stock short against the box, is the existence of a pertinent duty upon defendant and a breach of that duty by negligent or wilful conduct. The source of defendant's duties in the premises is the pledge agreements and the placement by plaintiffs of shares of stock with defendant pursuant thereto. The nature and extent of those duties are defined by the agreements and the law governing pledges. The law governing rights and obligations foundational to liability premised upon negligent conduct generally, bailments, fraud, constructive trusts and interference with contractual obligations or business opportunities is inapplicable. The allegations in plaintiffs' causes of action premised on these inapplicable theories of law are the product of a grab bag; are merely legal sounding phrases; and, in light of the ultimate controlling facts in the case, have no consequential meaning.

The principles of law governing pledges are provided by the Uniform Commercial Code.[5] Particularly pertinent to the issues at bench are the provisions of sections 1102, 9201, 9207, 9501, 9504 and 9507.

---

[5]We comply with section 1101 of the code which provides: "This code shall be known and may be cited as Uniform Commercial Code." We add the word California

A pledge agreement "is effective according to its terms between the parties" (Cal. U. Com. Code, § 9201); and may vary the effect of the provisions of the code, except it may not disclaim "the obligations of good faith, diligence, reasonableness and care prescribed" thereby; however, it may provide "the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable" (Cal. U. Com. Code, § 1102, subd. (3)).

Subdivision (1) of section 9207 provides: A pledgee "must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." Plaintiffs contend the duty thus imposed requires a pledgee to exercise reasonable care to preserve the value of pledged shares of stock. The official code comment on section 9207, prepared by the American Law Institute and National Conference of Commissioners on Uniform State Laws, declares the foregoing provisions of the section state "the duty to preserve collateral imposed on a pledgee at common law," citing Restatement of Security, §§ 17-18 (23C West's Cal. Codes Annot., Cal. U. Com. Code (1964) p. 426; Deering's Annot. Cal. Code, Cal. U. Com. Code, § 9207 (1970) p. 296). Comments in the Restatement respecting the cited sections thereof declare, (1) "The rule of reasonable care expressed in this Section (17) is confined to the physical care of the chattel, whether an object such as a horse or piece of jewelry, or a negotiable instrument or document of title"; (2) a pledgee of instruments representing claims is obligated to exercise reasonable care to collect such; but (3) a "pledgee is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline." (Rest., Security, §§ 17-18, pp. 65-67.)

In support of their position the pledgee of shares of stock has a duty to exercise reasonable care to preserve the value thereof, as distinguished from the duty to preserve the instruments evidencing such, plaintiffs cite the decisions in *Reed* v. *Central National Bank of Alva* (10th Cir. 1970) 421 F.2d 113, 116; *Amick* v. *Empire Trust Co.,* 317 Mo. 157 [296 S.W. 798, 802, 53 A.L.R. 1064]; *National Exchange Bank* v. *Kilpatric,* 204 Mo. 119 [102 S.W. 499, 501-502]; and *Grace* v. *Sterling, Grace & Company,* 30 App.Div.2d 61 [289 N.Y.S.2d 632, 637]. These decisions, and the opinions in support thereof, are not authority for plaintiffs' position when viewed in light of their factual situation which differs in material aspects from the factual situation at bench.

in our references to distinguish the California code from the Uniform Commercial Code prepared and sponsored nationally and which uses similar numbering.

However, assuming, without deciding, the duty of a pledgee of shares of stock to exercise reasonable care to preserve the collateral in his possession requires him to exercise reasonable care to preserve its value, the issue at bench is whether the discharge of this duty, i.e., the exercise of reasonable care, required defendant to consent to a sale of call options to purchase part of the pledged shares within six months and ten days, and to consent to a sale of the remaining shares, short against the box, for an amount less than the loans secured. Plaintiffs contend the question whether the exercise of ordinary care required defendant to consent to the sales of call options and of shares short against the box is a question of fact and not of law. Defendant contends, under the circumstances at bench the question is one of law and, as a matter of law, the exercise of ordinary care did not require it to consent.

Acceptance of the proposal to sell call options on 20,000 shares of the pledged stock would have required defendant to hold these shares for an additional six months and ten days, i.e., the option period. It is not alleged the loans secured by the pledge agreement would not be payable until the right of the purchaser of the call options had been exercised or had expired. At the hearing on the demurrers in the trial court defendant asserted, and plaintiffs did not deny, the loans were in default at the time plaintiffs asked defendant to consent to the transaction proposed by Blair & Co. Plaintiffs allege they informed defendant it was probable the value of the pledged shares would decline, and within nine trading days they did decline. The probable return from the proposed sale of the call options would not have exceeded $100,000, which was $872,000 less than the amount of the loans secured. Defendant's consent to the sale of the options would have been tantamount to an agreement to refrain from asserting its right under the pledge agreements to sell the shares subject to the options for a period of six months and ten days in exchange for $100,000. Acceptance of the proposal to sell an additional 20,000 shares at $37 per share would have been tantamount to a release thereof for not to exceed $740,000, which was $232,000 less than the amount of the loans secured. Acceptance of both the proposal to sell call options on 20,000 shares and the proposal to sell an additional 20,000 shares short against the box would not have produced an amount sufficient to pay the loans secured, and would have impaired the security defendant held under the pledge agreements. A pledgee has the "right to retain the pledged security until the principal obligation has been satisfied" (*Mitchell* v. *Auto. etc. Underwriters,* 19 Cal.2d 1, 4 [118 P.2d 815, 137 A.L.R. 923]; *MacDonald* v. *Pacific Nat. Bank,* 66 Cal.App.2d 357, 367 [152 P.2d 360]). Under the circumstances at bench, defendant's refusal to consent

to the proposed transaction, as a matter of law, did not constitute a failure to exercise reasonable care to preserve the pledged stock.

■ The provisions of sections 9501 through 9507 of the California Uniform Commercial Code, governing the rights and duties of a pledgee after default by a pledgor, apply to the case at bench insofar as they favor defendant's position, because it is not alleged plaintiffs were not in default when defendant refused to consent to the transaction proposed by Blair & Co. By virtue of these provisions the pledgee of shares of stock, upon default of the pledgor, has the right to sell the pledged shares and apply the proceeds to satisfaction of the loans secured by the pledge (Cal. U. Com. Code, §§ 9501-9504, subd. (1)); is authorized to sell such "as a unit or in parcels, . . . at any time and place and on any terms" provided he "acts in good faith and in a commercially reasonable manner" (Cal. U. Com. Code, § 9504, subd. (3)); and the fact "a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." (Cal. U. Com. Code, § 9507, subd. (2).) The code also provides: "If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner." (Cal. U. Com. Code, § 9507, subd. (2).) ■ In effect the code authorizes a pledgee of shares of stock, upon default of the pledgor, to sell the pledged shares at any time on any terms, provided he acts "in good faith and in a commercially reasonable manner"; by definition of the term "commercially reasonable manner" negatives the existence of any duty on such a pledgee, acting in good faith, to exercise reasonable care to obtain the best price for the shares sold provided he sells at a price current in a recognized market for the sale of such shares; and, thus, authorizes such a pledgee, acting in good faith, to refuse to consent to sell at a time or upon terms designated by the pledgor. The fact the price obtainable on a sale of the pledged shares of stock at the time and in the manner proposed by Blair & Co. would have been better than the price obtained by defendant would not support a finding it did not act in good faith or in a commercially reasonable manner; and there are no other adequately alleged facts which would support a finding either defendant did not act in good faith or did not act in a commercially reasonable manner.

The facts alleged in plaintiffs' second amended complaint, under the

rules heretofore stated, do not establish defendant is liable for any loss sustained by plaintiffs from defendant's sale of the K.F.C. shares of stock either on account of a claimed breach of duty to preserve the value thereof, or in the manner of selling them.

Every pledge agreement, by virtue of the covenant of good faith and fair dealing implied in every contract (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 658 [328 P.2d 198]; *Universal Sales Corp* v. *Cal. etc. Mfg. Co.,* 20 Cal.2d 751, 771 [128 P.2d 665]), imposes on the pledgee the duty to consent to a sale of pledged property for the purpose of satisfying in full the loans secured by the pledge. To invoke this duty the proposed sale must be for a price which will produce sufficient money to pay the loans secured by the pledge. These principles are not applicable to the case at bench. As to the K.F.C. shares of stock, the total amount plaintiffs hoped to obtain from the proposed sale of the call options and of shares short against the box was less than the amount of the loans secured. As to the Food Baron shares of stock it is not alleged plaintiffs requested permission to or could have sold the pledged shares for an amount which of itself or in conjunction with the proceeds from the sale of call options and of other shares short against the box would have produced sufficient money to pay the loans secured, or for any specified amount.

Plaintiffs attack the validity of provisions in the pledge agreements proscribing the sale of, or an interest in, the pledged shares without defendant's consent, and declaring defendant was not obligated to "insure, process and preserve the Collateral." The validity of these provisions is not relevant to the issue of defendant's liability. Under the facts in the case, defendant's consent to sell call options on K.F.C. shares, to sell other such shares short against the box, or to sell or pledge Food Baron shares was necessary to effect consummation thereof independently of any provision in the pledge agreements and, as heretofore noted, it had no duty to consent, because the proposed sales or pledge would have impaired its security and rights under the pledge agreements. Likewise, defendant's right to refuse to consent to the transaction proposed by Blair & Co., and its right to sell as it did upon plaintiffs' default, were not premised on the provision it was not obligated to "insure, process and preserve the Collateral" but upon the provisions of the California Uniform Commercial Code. Under these circumstances, plaintiffs' claim the provisions in question are invalid does not present a controversy subject to declaratory determination. (*California Water & Telephone Co.* v. *County of Los Angeles,* 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618]; *Silva* v. *City*

& *County of San Francisco,* 87 Cal.App.2d 784, 789 [198 P.2d 78]; *Monahan* v. *Dept. of Water & Power,* 48 Cal.App.2d 746, 751 [120 P.2d 730].) As a consequence the general demurrer to the declaratory relief cause of action premised on these claims properly was sustained.

The order sustaining the general demurrer without leave to amend was not error.

The judgment is affirmed.

Brown (Gerald), P. J., and Ault, J., concurred.