FIRST NATIONAL BANK OF KENOSHA, Plaintiff-Respondent, v. HINRICHS, Defendant-Appellant.

Supreme Court

*No. 76–327. Argued April 30, 1979.—Decided June 12, 1979.*
(Also reported in 279 N.W.2d 449.)

For the appellant there were briefs by *David L. Black* and *Schoone, McManus & Hanson, S.C.,* of Racine, and oral argument by *Mr. Black.*

For the respondent there was a brief by *Neil F. Guttormsen* and *Heide, Sheldon, Hartley, Thom & Wilk,* and oral argument by *Mark J. Leuck,* all of Kenosha.

DAY, J.   This is an appeal from a judgment entered September 21, 1976 in the circuit court for Kenosha County, the Honorable Earl D. Morton, presiding, in which the plaintiff, First National Bank of Kenosha was granted a deficiency judgment of $35,908.43 against the defendant, Ferdinand Hinrichs, Jr., following sale of securities held as collateral for loans.

The questions on appeal are:

1. In an action for a deficiency judgment, following notice and public sale of collateral consisting of publicly traded securities, is an otherwise commercially reason-

able sale rendered unreasonable by the fact that the secured party waited seven months after default to sell the collateral?

We hold that under the facts in this case it was not.

2. Was the finding by the trial court that the bank's delay in the sale of the securities was in response to the debtor's request that the bank withhold sale against the great weight and clear preponderance of the evidence?

We hold the finding was not against the great weight and clear preponderance of the evidence.

On September 3, 1965, Ferdinand T. Hinrichs, Jr. and the First National Bank of Kenosha entered into an agency agreement providing that the Bank hold certain securities as agent for Mr. Hinrichs. With such an agency account, the Bank deals with the securities at the direction of the principal only. The securities were registered in Mr. Hinrichs' name, and the bank had the duty to safekeep the securities, maintain records, complete trades, and take care of similar matters at Mr. Hinrichs' direction. At the time the agency account was funded, the value of the assets was approximately $408,000.

On November 20, 1970, Mr. Hinrichs signed a pledge agreement which pledged all of the assets of the agency account as security for his loans with the bank. The agreement allowed the assets to remain with the trust department as part of the agency account, and allowed Mr. Hinrichs to buy and sell the securities as if they were not pledged. However, he could not remove assets from the agency account to reduce the principal value, without the permission of the bank. At the time the pledge agreement was signed, Mr. Hinrichs' assets in the agency account exceeded the amount of his loans from the bank. The pledge agreement provided that in the event of default, the bank would have the rights and remedies provided in the Uniform Commercial Code in effect in Wisconsin.

In the summer of 1973, the bank became concerned that the loans were not sufficiently collateralized. As a result, Mr. Hinrichs refinanced his indebtedness by increasing the mortgage on his farm homestead. Approximately $20,000 of the proceeds went into the agency account, and about $50,000 was applied to reduce his promissory note to the bank. The refinancing reduced his indebtedness to the bank from $131,271.77 to $81,271.77. Mr. Hinrichs signed a note for $81,271.77 with a maturity date of September 4, 1973. On September 4, 1973, the bank renewed the note with a new due date of December 4, 1973.

On December 4, 1973, Mr. Hinrichs did not pay the note, and as a result, the loan became delinquent as of December 5, 1973. By letter dated December 26, 1973, Calvin Kersten, vice president of First National Bank of Kenosha, in charge of the mortgage loan department, informed Mr. Hinrichs that that bank was taking possession of the collateral, and notified him that it intended to sell the collateral after a five day period. Prior to that time, Mr. Hinrichs had asked the bank for forbearance. As of December 31, 1973, the book value of the assets in the agency account was $82,411.02. However, the fair market value of the stock was only $72,486.16. Mr. Hinrichs owed the bank $81,271.77 on that date. The securities were regularly traded on the stock market except for two which went to Mr. Hinrichs at the time the bank took possession.

Mr. Kersten testified that shortly after the letter of December 26, 1973, Mr. Hinrichs called him and asked that the bank not sell his collateral. Mr. E. M. Miller, a bank vice president in the trust department, also testified that in January, 1974, he and Mr. Hinrichs discussed the securities in the agency account, and that Mr. Hinrichs expressed the view that the stocks would "rebound from where they were at now. He felt that

by holding them longer he would be able to come up with a better result. As he would put it in his vernacular, 'don't blow me out at this stage.'" Later in January, Mr. Hinrichs requested that the bank sell his American Motors shares which had increased in value. The sale was completed as Mr. Hinrichs requested through his broker.

Mr. Miller testified further that in the months of January, February, and March of 1974, he had conversations with Mr. Hinrichs about his shares of A.T.O., Inc. According to Mr. Miller, Mr. Hinrichs expressed the idea "that he felt that this particular stock, we would all be better off, as he would put it, if it could be held until the comeback so we would come back rather than blow him out. This was being expressed as to all the assets we held there, but most particularly he felt he had a very good knowledge of A.T.O."

In April or May, 1974, Mr. Hinrichs was still expressing optimism about the market and "about the particular securities we were holding in his collateral, that he felt they would have a rebound, and it was due to happen any day. He also was still expressing a hope that his father would be able to come to his financial assistance so that he would not lose—this farm was also involved along with the securities."

Two meetings were set up for Mr. Hinrichs and his father to meet with a group of bank officers to discuss the deficiency, according to Mr. Kersten's testimony. However, these meetings were never held. After the second appointment was not kept, the bank by letter dated July 11, 1974, gave Mr. Hinrichs an additional five day notice that it planned to sell the collateral and if insufficient to cover the amount due, to seek a deficiency judgment.

The securities were sold during July and August of 1974 through Mr. Hinrichs' broker. After the last sale, there remained a deficiency of $30,899.71 plus interest.

The bank then sued for a deficiency judgment. The trial court determined that the bank had proven that the sale of the securities was commercially reasonable, and granted judgment for the bank of $35,908.43, representing the deficiency plus interest. Mr. Hinrichs appealed, contending the delay in the sale of the securities rendered the sale unreasonable and that the bank was not entitled to any deficiency judgment.

QUESTION #1: IN AN ACTION FOR A DEFICIENCY JUDGMENT, FOLLOWING NOTICE AND PUBLIC SALE OF COLLATERAL CONSISTING OF PUBLICLY TRADED SECURITIES, IS AN OTHERWISE COMMERCIALLY REASONABLE SALE RENDERED UNREASONABLE BY THE FACT THAT THE SECURED PARTY WAITED SEVEN MONTHS AFTER DEFAULT TO SELL THE COLLATERAL?

The sections of the Uniform Commercial Code, as adopted by Wisconsin, pertinent to this appeal are:

Sec. 409.504(3), Stats., (1973):

"409.504.   Secured party's right to dispose of collateral after default; effect of disposition. . . . (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in

this state. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

Sec. 409.507(2), Stats., (1973):

"409.507. **Secured party's liability for failure to comply with default provisions. . . .** (2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the 2 preceeding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does not indicate that any disposition not so approved is not commercially reasonable."

Sec. 409.504(3), Stats., *supra*, requires that ". . . every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." Sec. 401.203 further provides that: "Every contract or duty within this code imposes an obligation of good faith in its performance of enforcement."

These sections of the code were discussed by this court in *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis.2d 106, 203 N.W.2d 728 (1973). The court stated:

"The purpose of the Uniform Commercial Code is the protection of both the creditor and the debtor. Each party to the transaction has certain duties. The duty of the secured party in this instance was to obtain the best possible price it could obtain for the collateral for the benefit of the debtor. The secured party does not have to use 'extraordinary means' to accomplish this result. Ordinarily, proof that the price obtained was the fair market value thereof would be sufficient." *Id.* at 111–112. (footnotes omitted).

*Vic Hansen & Sons, supra,* was decided in the context of a private sale of collateral. The court emphasized the private aspect of the sale in its opinion, stating:

"It is our opinion that those jurisdictions which hold that the secured party must establish that every aspect of the sale was commercially reasonable enunciate a rule that more appropriately recognizes the tenor of the code. This will henceforth be the rule in this state in those instances where the property is sold at 'private sale.' The secured party has the duty under the code to proceed in good faith and in a commercially reasonable manner. It follows that he who has the duty should also have the burden of proof.

"Upon trial it was necessary for the plaintiff to establish that every aspect of the sale was commercially reasonable, including the adequacy of the price for which the collateral was sold." *Id.* at 113. (footnotes omitted).

While the court did not specify what its view would be in the case of a public sale, cases from other jurisdictions holding that the secured party bears the burden of proving the commercial reasonableness of the disposition of collateral ordinarily have drawn no distinction between public and private sales of collateral. *Annotation: Uniform Commercial Code: Burden Of Proof As To Commercially Reasonable Disposition Of Collateral,* 59 ALR3d 369 and cases collected therein.

Sec. 409.507(2), Stats., specifically states that "[i]f the secured party either sells the collateral in the usual

manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner."

The collateral in the instant case consisted of publicly traded securities which were disposed of through the debtor's own broker. In White and Summers, *Uniform Commercial Code,* Hornbook Series (1972), the authors comment:

"Certainly, the New York Stock Exchange and the bond and commodity markets are 'recognized markets.' Such places are arenas of pure competition in the classical sense of the term. The forces of supply and demand determine price and the valuation of goods and such market places are relatively free from human connivance and manipulation." *Id.* at 984.

Contrary to the debtor's assertions, the trial court did not assign the burden of disproving commercial reasonableness to him. The bank proved, and the debtor does not dispute, that the securities were disposed of "in the usual manner in [a] recognized market." Nor does the debtor dispute that the price obtained for the stock on the day of sale was the fair market value of the stock at that time.

The only real challenge raised by Mr. Hinrichs to the commercial reasonableness of the sale was the time of sale. He contends that the sale was commercially unreasonable because the bank waited seven months after default to sell the securities.

Commentators have pointed out that unlike prior statutes, such as the Uniform Conditional Sales Act, the Uniform Commercial Code, has, with the exception of consumer goods, deliberately omitted any time limitation within which the collateral must be sold in order to

encourage the secured party to undertake private dispositions through regular commercial channels. Siegel, *The Commercially Reasonable Disposition Of Collateral*, 80 Comm. L.J. 67 (1975), See also, Official Comment No. 6 to sec. 409.504.

Further, sec. 409.507 provides in pertinent part: "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Nevertheless, the secured party would still have the burden of showing the commercial reasonableness of every aspect of the sale. *Vic Hansen & Sons*, 57 Wis.2d at 113. This burden of showing commercial reasonableness includes the time of sale. Sec. 409.504 (3), *supra*.

However, the bank showed that the delay in disposing of the securities was in response to Mr. Hinrichs' own request that the bank hold onto the shares until the market came back up. Further, there was testimony that Mr. Hinrichs expressed hope that his father would help relieve his financial problems.

We hold that the conduct of a debtor may be taken into account in determining the commercial reasonableness of a sale. See *Old Colony Trust Company v. Penrose Industries Corp.*, 280 F. Supp 698, 717 (E.D. Pa 1968) ; see also *Ralston-Purina v. Bertie*, 541 F.2d, 1363, 1366 (9th Cir. 1976).

In *Hutchison v. Southern California First National Bank*, 27 Cal. App.3d 572, 103 Cal. Rptr. 816 (1972), the pledgors of stock sued the pledgee bank for an alleged breach of duty to preserve the value of collateral due to the bank's refusal to consent to a proposed transaction to sell call options and shares of pledged stock

"short against the box." In that case, the debtors, predicting a decline in the value of the shares they had pledged to the bank to secure a loan, proposed a two part transaction to preserve the value of the stock by selling call options on the shares, and later selling short, with the proceeds to be placed with the bank. The value of the shares did, in fact, decline, as predicted by the debtors. Their cause of action against the bank was found defective for a number of reasons. Pertinent to this case, however, are the comments made by the court with regard to the duties imposed by the Uniform Commercial Code:

"In effect the Code authorizes a pledgee of shares of stock, upon default of the pledgor, to sell the pledged shares at any time on any terms, provided he acts 'in good faith and in a commercially reasonable manner;' by definition of the term 'commercially reasonable manner' negatives the existence of any duty on such a pledgee, acting in good faith, to exercise reasonable care to obtain the best price for the shares sold provided he sells at a price current in a recognized market for the sale of such shares; and, thus, authorizes such a pledgee, acting in good faith, to refuse to consent to sell at a time or upon terms designated by the pledgor. The fact the price obtainable on a sale of the pledged shares of stock at the time and in the manner proposed by Blair & Co. would have been better than the price obtained by defendant would not support a finding it did not act in good faith or in a commercially reasonable manner; and there are no other adequately alleged facts which would support a finding either defendant did not act in good faith or did not act in a commercially reasonable manner." *Id.* at 823.

Cases relied upon by Mr. Hinrichs did not involve stock pledged as collateral, but instead items which were likely to depreciate rapidly. In *Harris v. Bower*, 226 Md. 579. 295 A.2d 870 (1972), for example, the secured party repossessed a yacht and held it for two boating seasons,

allowing it to depreciate. In *Dynalectron Corp. v. Jack Richards Aircraft Co.*, 337 F. Supp 659 (W.D. Okla. 1972), the secured party sold an aircraft within twenty-eight days of repossession. That case, however, turned on the failure to advertise or to make normal and reasonable contacts within the aircraft industry to dispose of the aircraft. In *Farmers State Bank of Parkston v. Otten*, 87 S.D. 161, 204 N.W.2d 178 (1973), the secured party took physical possession of a tractor and trailer without ever making any attempt to sell the collateral.

While there may be instances in which a delay in the sale of pledged securities would be commercially unreasonable, here the record shows the bank acted in good faith in attempting to accomodate the debtor. The bank met its burden of showing that the sale was commercially reasonable.

QUESTION #2: WAS THE FINDING BY THE TRIAL COURT THAT THE BANK'S DELAY IN THE SALE OF THE SECURITIES WAS IN RESPONSE TO THE DEBTOR'S REQUEST THAT THE BANK WITHHOLD SALE AGAINST THE GREAT WEIGHT AND CLEAR PREPONDERANCE OF THE EVIDENCE?

There was testimony by two bank vice presidents that from December, 1973 to April or May, 1974, Mr. Hinrichs repeatedly requested the bank not to sell his securities, expressing his faith the stocks would rebound to their former value. There was also testimony by Mr. Miller that Mr. Hinrichs had expressed hope that his father would help him out of his financial difficulties.

There appears to be no evidence in the record to support a finding that Mr. Hinrichs' father made any promises to the bank. But the findings by the trial

226

court that Mr. Hinrichs asked the bank to withhold sale and that he gave the bank a reason to believe his father would come to his aid were not against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.