Jimmy M. REED, Plaintiff-Appellant,

v.

CENTRAL NATIONAL BANK OF ALVA, a corporation, Defendant-Appellee.

No. 240–69.

United States Court of Appeals Tenth Circuit.

Jan. 23, 1970.

Rolland O. Wilson, Enid, Okl. (Owen D. Wilson, Enid, Okl., on the brief), for plaintiff-appellant.

William G. Paul and Andrew M. Coats, Oklahoma City, Okl. (Richard R. Downer, Thomas J. McDaniel, Alva, Okl., and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., on the brief), for defendant-appellee.

Before MURRAH, Chief Judge, and PICKETT and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The issue is whether an Oklahoma bank holding convertible debentures as collateral security for a loan is liable for failure to convert them into common stock to prevent an impairment in their value. The district court held that the bank had no duty and was not negligent. The pledgor, plaintiff-appellant Reed, appeals. Jurisdiction rests on diversity.

During the 1965 Christmas season pledgor, a California resident, visited his parents in Alva, Oklahoma. While there, he talked to Gertrude Meyers, the chairman of the board of the Central National Bank of Alva, where he had an account. The pledgor told the bank chairman that he was interested in a loan to purchase Collins Radio Company convertible debentures. After checking the quotation in the Wall Street Journal, the chairman gave her preliminary approval. The pledgor was furnished a promissory note and security agreement to execute if he decided to purchase the debentures. The agreement was that the loan would be for 90% of the purchase price.

Pledgor decided to buy the debentures and arranged to do so through his broker, H. Hentz & Co. He executed the note and security agreement in California and sent them to the Alva bank. Hentz handled the transaction through the Chase Manhattan Bank of New York, which mailed the debentures to the Alva bank with a sight draft for $10,697.50. The Alva bank honored the draft. It accepted the note for $9,580 and debited the pledgor's account with the remainder.

The bank chairman placed the debentures in the vault. Although she did not examine them, she was aware of the difference between the face value, $4,000, and the market value, over $10,000. She knew that the debentures were convertible and that the terms of a security ordinarily appeared on the face of the instrument.

The debentures were titled "4¾% Convertible Subordinated Debenture due January 1, 1983," and were payable to bearer. They were convertible, at the rate of one share of stock for each $27.-50 of face value, any time before January 1, 1983, or, if they were called for redemption before then, until the close of the fifth business day preceding the redemption date. The place and manner of conversion were spelled out on the face of the debenture. The issuer had the right to redeem at any time prior to maturity at certain percentages of the face value. For 1966 the percentage was 104.

The security agreement between the pledgor and the bank gave the bank broad discretion with regard to the collateral and imposed few, if any, duties. It provided that the bank could substitute or exchange and that it would not be liable "on account of any failure to present for payment, or collect by suit or otherwise, any of the above described collateral."

In June 1966, the debentures were called for redemption on July 25. Thus, the last day for conversion was July 20. On June 18 or 19 the pledgor became aware of the call. On June 20 he sent the following letter to the bank chairman:

"Please be advised that Collins Radio Corporation has called its 4¾'s, 83 convertible debentures for conversion into common stock by July 25, 1966. I *would* like to exercise subject right on that date. I acknowledge understanding that I have thirty days after forementioned date to either increase owner's equity to a total of 70% or sell the stock resulting from conversion.

"A second following letter will contain my complete financial statement plus salary and position."

On June 21, the bank chairman sent pledgor an unrelated letter indicating concern over the market and suggesting the sale of the security and payment of the note. On June 27, the bank chairman replied thus to the pledgor's June 20 letter:

"Your letter of June 20th received regarding the Collins Radio Corporation convertible debentures. If these debentures are converted to common stock this whole deal will be subject to Federal Reserve 50% marginal requirements and you would not have enough equity to cover, so believe that the debentures should be sold. Bonds and debentures do not come under Federal Reserve but common stock does.

"Received the financial statement in the mail this morning."

On July 8, pledgor responded:

"With reference to your letter dated June 27, 1966 regarding 4M Collins Radio Corporation 4¾'s '83 debentures, I would like to convert the subject debentures to 145.44 shares of common stock by increasing my equity to meet the 50 per cent marginal requirements of the Federal Reserve. I will deposit $4,300.00 to cover said requirements within two weeks.

"My decision to accept conversion into common stock has been corroborated by my stockbroker who is sending a follow-up letter stating such."

Although the pledgor knew that the margin requirement was 70% when stocks were bought through a broker, he credited the bank chairman with knowing what the bank requirement was and assumed that 50% was the correct figure. A check for $4,300, representing the difference between the original equity of 10% and 50%, was received by the bank on July 22. There was no cover letter. The chairman was out of town and had told no one about the transaction. The check was routinely deposited

by the cashier in the pledgor's checking account.

On August 24 the pledgor became concerned because he had heard nothing from the bank on the conversion. His broker called the chairman and learned that there had been no conversion. The chairman then discovered the $4,300, debited the pledgor's account in that amount, and credited it to the note. On the same day she wrote the pledgor:

> "We have credited your note with $4300.00 sent in a few days ago, leaving the remaining balance of $5280.00. Please let us know when the bonds will be converted into stock and how you plan to pay the balance of the note. We are increasing our interest rate to 7%.

> "We believe the market is too unstable and speculative to carry these deals for you and would like for you to make other arrangements for a payoff."

Subsequent efforts by the pledgor and the bank to convert were fruitless. The debentures were sold at the redemption price of 104% and the proceeds applied on the note together with other credits, leaving a balance of $385.35 plus interest which was unpaid at the time of the suit. The pledgor then sued the bank to recover the amount lost by the failure of the bank to convert the debentures. The bank counterclaimed for the unpaid balance on the note.

The evidence shows that the bank chairman had never handled a convertible debenture before. Although she was aware of the difference between the face and market value of the debentures, she had no idea that failure to convert would cause the market value to plummet. The pledgor's letters seemed tentative to her, and it would not have made any difference in her conduct if his first letter had mentioned the correct conversion deadline rather than July 25. She believed that specific information about conversion would come from the pledgor and did not think to look at the debentures for pertinent information. She

did not inform the pledgor of her lack of knowledge. On July 20, the market value of the common stock was $64. Thereafter it varied from a low of $39.125 on October 31, 1966, to a high of $113.875 on July 11, 1967.

Trial was to the court, which found that the bank had no duty to convert the debentures; that it was not otherwise negligent; that the pledgor was negligent; that there was no agreement that the bank would convert; and that the pledgor was liable on the bank's counterclaim.

The pledgor centers his attack on the trial court's holding that the bank had no duty to convert and relies heavily on the Uniform Commercial Code, which has been adopted in Oklahoma. The pertinent provision, 12A Okl.St.Ann. § 9–207, reads:

> "(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

> \*　\*　\*　\*　\*　\*

> "(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest."

The Oklahoma Code Comment to subsection (1) states that the previous Oklahoma law is in accord and cites former 55 Okl.St.Ann. § 12 and Peru Van Zandt Implement Co. v. Burnett, 32 Okl. 304, 122 P. 668. This view of the pre-code law finds support in Grace v. Sterling, Grace & Company, 30 App.Div.2d 61, 289 N.Y.S.2d 632, 638, and authorities there cited. The bank's argument to the contrary, based on decisions from states other than Oklahoma, is not persuasive. The Code controls.

Since the adoption of the Code, there have been no Oklahoma decisions relating to the pertinent section. One purpose of the Code is "to make uniform the

law among the various jurisdictions." See 12A Okl.St.Ann. § 1–102(2) (c); see also Val Decker Packing Co. v. Corn Products Sales Co., 6 Cir., 411 F.2d 850, 853, and Layton Investment Co. v. Harris, 43 Wis.2d 21, 168 N.W.2d 70, 73.

In the circumstances the decision in Grace v. Sterling, Grace & Company, 30 App.Div.2d 61, 289 N.Y.S.2d 632, is persuasive. There the plaintiff pledged convertible bearer debentures with a face value of $25,000 to a brokerage firm which repledged them to a trust company. The debentures, which could be converted prior to redemption, were called for redemption on October 1, 1964, and notice of the call was given by publication. No communications passed among the parties. Indeed, the plaintiff was traveling abroad at the time. On October 1, the market value of the stock into which the debentures could have been converted was $49,490. No conversion was made. The trial court gave judgment against the broker but denied relief against the trust company. On appeal both the broker and the trust company were held liable.

The court quoted the provisions of the Code which we have set out and said, 289 N.Y.S.2d 632 at 638, that "where pledged convertible debentures are called at par and thereby become payable while in the control of a pledgee, he may be required in the exercise of reasonable care to do more than just stand by and wait for payment of the face value of the securities."

In our case the bank is in the position occupied by the broker in Grace. Although the court in Grace disagreed as to the liability of the trust company, it was unanimous in sustaining the liability of the broker. The pledgor here is in a better position than his counterpart in Grace because he took affirmative action to obtain conversion.

■ The bank argues that the trial court's finding of no negligence on its part absolves it from liability. The question can be more adequately stated to be whether, on the facts presented, the bank used reasonable care. The first sentence of § 9–207(1) requires a secured party to "use reasonable care in the custody and preservation of collateral in his possession." In agreement with Grace, we believe that the word "preservation" includes preservation of value. See 289 N.Y.S.2d 632 at 637–638. The obligation to use reasonable care is imposed by the statute. The security agreement could modify this duty only by establishing standards of reasonable care. 12A Okl. St.Ann. § 1–102(3). In our opinion the provisions purporting to exculpate the bank do not constitute such standards.

■ On June 20 the pledgor wrote that he "*would* like" to exercise the conversion right. The bank's June 27 reply centered on margin requirements. The pledgor's July 8 response reiterated his desire to convert and said that he would send the requested amount to meet the margin requirement. He sent the money and the bank deposited it in his checking account.

The claim that the letters and directions were equivocal is not convincing. They show an unambiguous direction to convert and the desire and ability to meet the margin requirements asserted by the bank. In the exercise of its duty of reasonable care, the bank should either have carried out pledgor's request or told him that it would not do so. It did neither.

The trial court also held that the pledgor "was guilty of contributory negligence in the manner in which he handled the transaction." If contributory negligence is a factor, the facts found do not sustain the conclusion. As we see the situation, the question is whether any conduct of the pledgor relieved the bank of its duty to use reasonable care. The pledgor notified the bank of his desire to convert and forwarded the requested amount for margin. This was enough. See Traverse v. Liberty Bank & Trust, Mass.Superior Ct., 5 UCC Reptr. 535, where the pledgor did not even attempt to notify the pledgee of the upcoming

redemption and Grace, supra, 289 N.Y.S. 2d 632, where the pledgor was out of the country at the critical time. The bank's emphasis on the statement in pledgor's June 20 letter which gave the redemption date instead of the conversion date is not pertinent. Nothing shows that the bank was mislead or would have done anything differently if the correct date had been shown.

■ The bank argues that it had no right or authority to convert before default. This is answered by the Code, which provides, 12A Okl.St.Ann. § 9–207 (4), that a "secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement." Because the conversion would have been to preserve value and because the security agreement gave the bank broad powers to deal with collateral, conversion would have been permissible under either the first or third alternative. Nothing in the security agreement detracts from the bank's statutory duty to use reasonable care in the preservation of the security.

When the pledgor notified the bank of the call for redemption and requested conversion, the bank should either have converted or given the pledgor ample notice that it would not do so. The failure to act after notice from the pledgor was a breach of the bank's duty to use reasonable care. The inexperience of the chairman and the lackadasical operation of the bank do not excuse the failure to act. We are convinced that the bank is liable to the pledgor for its failure to convert the debentures after notice.

Finally, we consider the question of damages. Pledgor claims that the measure of damages should be the highest value of 145.44 shares of stock (the number of shares the bonds could have been converted to) between July 20, 1966, and the date suit was brought, less the amount for which the debentures were redeemed. The bank contends that damages should be computed on the basis of the market price of the stock on the date the conversion rights expired. Because the market price of the stock was $64 per share on July 20, 1966, and $113.875 per share on July 11, 1967, the difference between the two computations is substantial.

■■ We agree with the bank. Because the value of the debentures was incurably impaired by the bank's failure to convert, the damage issue may be characterized as involving the permanent destruction of personal property. In such cases, the rule in Oklahoma is that the measure of damages is the value before the injury less the value after the injury. A. B. C. Construction Co. of Oklahoma v. Thomas, Okl., 347 P.2d 649. This rule has previously been applied by this court, in a case involving New Mexico law. Robert E. McKee General Contractor, Inc. v. Insurance Co. of North America, 10 Cir., 269 F.2d 195.

The application of this rule to the present situation means that the pledgor's damages should be computed by subtracting from $9,308.16 (the value of the four bonds or 145.44 shares of stock on July 20, 1966) $4,172.68 (the amount which the bonds were thereafter worth, as represented by their redemption price). From this resultant figure of $5,135.48, plus appropriate interest, it is necessary to deduct the amount of the bank's counterclaim, that is, the amount remaining unpaid on the note together with accumulated interest.

Reversed and remanded for the computation and award of damages consistent with this opinion.