**FIDELITY BANK & TRUST COMPANY OF NEW JERSEY**

v.

**PRODUCTION METALS CORPORATION et al.**

Civ. A. No. 70–2040.

United States District Court, E. D. Pennsylvania.

Sept. 18, 1973.

William Miller, Philadelphia, Pa., for plaintiff.

Robert H. Malis, Malis, Tolson & Malis, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HANNUM, District Judge.

This is a case based on diversity of citizenship. Before the Court is the plaintiff's motion for summary judgment. The question raised is whether, under the law of New Jersey, the holder of negotiable securities pledged as collateral to secure a guarantee of a loan is, upon the request of the pledger and after default by the principal obligor, under a duty to sell the collateral within a reasonable time or thereafter suffer any loss caused by a decline in the value of the securities.

The plaintiff, Fidelity Bank and Trust Company of New Jersey (formerly, the Pennsauken Bank) is a domestic banking corporation created and existing under the laws of the State of New Jersey with its principal place of business in Pennsauken. The defendant, Production Metals Corporation, is a business corporation incorporated under the laws of Pennsylvania with its place of business in Jenkintown. Each of the defendants are citizens of the State of Pennsylvania residing in Wyncote. The material facts are not in dispute.

On September 12, 1969, the plaintiff bank consolidated several prior loans to the defendant Production Metals Corporation in the total amount of $84,179.29. The corporation, by its president, Defendant Murray A. Stein, executed a promissory note in said amount payable to the bank on demand. In order to secure payment of the note the defendants Murray A. Stein and George A. Stein, now deceased, executed and delivered to the plaintiff on the same date an unconditional guarantee whereby they personally guaranteed repayment of the loan upon any default by Production Metals Corporation. To secure the guarantee, the individual defendants assigned to the bank 10,611 shares of Welded Tube Company of America common stock having a market value on that date of $83,561.63. The stock was then and is now traded on the American Stock Exchange.

The demand note provided in pertinent part as follows:

". . . the undersigned hereby agrees, whenever the total value of the collateral so held by the holder hereof, shall be insufficient in character, kind or amount in the holder's sole opinion and discretion to cover all indebtedness and liabilities as aforesaid of any of the undersigned to the holder hereof, with a margin added thereto satisfactory to the holder, to immediately reduce such indebtedness and liabilities or to deposit with the holder additional collateral to the satisfaction of the holder . . . and in default thereof this note shall forthwith without further demand or notice, and regardless of whether otherwise due by

the terms hereof or not, become immediately due and payable.[1]

On September 12, 1969, the amount of the loan exceeded the value of the collateral by $612.66. By December 30, 1969, the amount of the loan had been reduced by $6,000. The value of the stock, however, had dropped considerably. Following a review of the loan, the bank sent Production Metals Corporation, through Murray Stein, a letter requesting the deposit of $15,000 in the corporate account by January 10 and the delivery of additional securities to meet the bank's margin requirements. In the same letter, the bank notified the defendants that repayment of the loan was henceforth to be maintained at $2,000 per month and that "failure to comply with [these requests] will leave us no alternative other than to demand payment in full of the balance of your loan."[2] At the time the letter was sent, the debt had been reduced to $78,174.29. The collateral had declined to a value of $61,013.25; the difference being $17,161.04.

On January 10, 1970, Murray Stein contacted the bank by telephone and informed Joseph Wilkens, the officer from whom the loan had been negotiated, that it would be impossible for Production Metals Corporation to deposit the compensating balance requested, and further, that he would be unable to deliver any additional securities. According to Mr. Stein it was during this conversation that a sale of the collateral was first mentioned.[3] This conversation took place on a Saturday. At the close of business on the preceding day, the value of the collateral had risen to $74,277.00 which, at that time, was $3,897.29 less than the amount of the debt.

Assuming that defendant Stein did in fact request the bank to sell the securities, the bank took no steps to sell the collateral. Surprisingly, the defendant himself made no attempt to determine whether or not the securities had been sold thereafter and, if so, for how much.[4] Equally surprising, Stein authorized the making of two additional payments in reduction of the loan, each in the amount of $2,000. The first was made on January 20,[5] while the second was made on February 24.[6]

On February 26, Joseph Wilkens sent the following letter to Murray Stein's attention at Production Metals Corporation:

"Recent review of your corporate loan in the Pennsauken Bank and our requests regarding compensating balances and additional collateral requirements have not been met, we have no alternative but to demand payment in full of your present outstanding balance of $74,174.29, plus interest, such payment should be in the Bank's hands on or before March 26, 1970 to prevent further action being taken."[7]

Upon receiving this letter Stein contacted the bank and declared that he could

---

1. Plaintiff's Motion for Summary Judgment, Exhibit A.

2. *Id.*, Exhibit C.

3. What was said during the course of the conversation is unclear. Murray Stein's testimony in his deposition of March 3, 1971, is subject to no less than three different interpretations: (1) That he was told by the bank that he should sell the securities (Dep. 23); (2) that the bank told him that it was going to sell the securities (Dep. 25); and (3) that he instructed the bank to sell the securities (Dep. 35).
According to the deposition of Joseph Wilkens, Murray Stein never instructed the bank that the securities were to be sold (N.T. 61) but rather that he could not meet the additional security requirements but did intend to make further payments in reduction of the loan.

4. According to Stein's mathematics at the time, he thought that the value of the securities exceeded the amount of the loan.

5. Reducing the debt to $76,174.29, the value of the collateral on that date being $71,624.25.

6. Reducing the debt to $74,174.29, the value of the collateral on that date being $66,318.75.

7. Plaintiff's Supplemental Memorandum in Support of Motion for Summary Judgment, Exhibit C.

not meet the demand. At the same time, he registered his surprise that the collateral had not already been sold. Following this conversation there is conflicting evidence as to the nature and amount of the contact between him and the bank.[8] In any event, on April 21, Stein received the following letter which, for the first time in the bank's correspondence, announced its intention to liquidate the collateral in order to reduce the debt:

"As per our telephone conversation, on our review of your loan account as of this date, the value of Welded Tube Corporation stock pledged as collateral on your loan is $5.50 per share, Our records indicate we have 10,611 shares for a total market value of $58,360 and a loan value of $40,852.00. The outstanding balance of your note is $74,174.29.

I have been instructed to inform you that if we do not receive payment of $33,324.29 on the principal balance of this loan and $1,044.70 interest on or before Friday, April 24, 1970, it will be necessary for us to sell your collateral and institute legal proceedings to recover the balance of your loan."[9]

Upon receipt of this letter, Stein called the bank seeking to know "what kind of games they were playing"[10] and why they had not yet sold the collateral as he had thought they were going to do. According to the defendant, Joseph Wilkens was not even certain why the stocks had not been sold.[11] Between May 1, and May 7, 1970, however, the stocks were

sold and the proceeds, amounting to $48,047.57, were applied in reduction of the loan. A balance of $26,126.72 having been further reduced by the amount of $5,530.90, the bank instituted the present suit to recover the remaining $22,696.85 plus interest. The defendants answered raising the "defense" that no deficiency is owing to the bank since it was negligent in failing to preserve the value of the collateral. In addition, the defendants filed a counterclaim alleging that if the collateral had been sold on or about January 10, 1970, the amount that would have been realized would have exceeded the amount of the loan by approximately $14,000. Since it has since been stipulated that the value of the collateral at any material time of record never did exceed the amount of the loan, the best the defendants can expect to accomplish, should they establish the existence of a cause of action against the plaintiffs, is a set-off. There being no dispute regarding the authenticity of the loan, the guarantee, the default on both, and the amount of the deficiency, the only obstacle to the grant of summary judgment in the plaintiff's favor is the question of the validity of the defendants' counterclaim.[12]

In the argument over the validity of the defendants' counterclaim, there is, at the outset, a dispute over whether the law of Pennsylvania or that of New Jersey controls the case. The defendants seek to have the Court apply the law of Pennsylvania whereas the plaintiff urges the applicability of the law of

---

8. In his deposition of March 3, 1971, Stein testified that after February 26, he contacted the bank only once perhaps twice, but in any event, never attempted to determine whether the collateral had been sold and, if so, for how much. (Dep. 29). Joseph Wilkens, on the other hand, testified that between February 26 and April 21, he had numerous telephone conversations with Stein in which Stein assured him that the loan would be reduced following the termination of a trucker's strike. In addition Wilkens stated that on April 15, 1970, Stein came to the bank requesting an additional loan. According to Wilkens the bank informed Stein that an additional loan would not be consid-

ered until the earlier loan was reduced by slightly more than $30,000 (thus reducing the outstanding amount to roughly $44,000 while the collateral would have had a value of roughly $60,000). (Dep. 59).

9. Plaintiff's Supplemental Memorandum in Support of Motion for Summary Judgment, Exhibit A.

10. Stein deposition of March 3, 1971, at 29.

11. *Id.* at 39.

12. The "defense" is, in reality, a permissive counterclaim and shall hereafter be regarded as such by the Court. Fed.R.Civ.P. 8(c), 28 U.S.C.

New Jersey. Since the validity of the counterclaim is controlled by the Uniform Commercial Code (the pertinent provisions of which have been enacted in both states) and since the question raised appears never to have been decided by the court in either state, the dispute concerning the applicable law could well be said to raise a false conflict. Nevertheless, to the extent that it could be said that the courts of either state might interpret the Uniform Commercial Code (hereinafter, Code) differently, it is clear that the law of the State of New Jersey governs this litigation.

Where there is a conflicts question in a diversity case, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), requires the District Court to determine the applicable law by first looking to the choice of law rules of the jurisdiction in which it sits. The Pennsylvania choice of law rules applicable to a suit of this nature are contained in the Code. The general choice of law rule is set forth in Article 1. In § 1–105(1), 12A P.S. § 1–105(1), it is stated that Pennsylvania law applies to "transactions bearing an appropriate relation to this state." In subsection (2), however, it is noted that where other provisions of the act specify the applicable law, those provisions govern. Specifically mentioned are §§ 9–102 and 9–103 of Article 9 on Secured Transactions. Section 9–102(1), 12A P.S. § 9–102(1), dealing with secured transactions, sets forth, by implication, the Pennsylvania policy of applying the law of the state where the collateral is located. The implication is confirmed by Official Comment 3 to Section 9–102 which states that "the law of the state where the collateral is located should be the governing law, without regard to possible contacts in other jurisdictions." Whereas Section 9–103(2) also sets forth choice of law rules applicable to the validity and perfection of security interests, those rules apply only to secured transactions where the collateral is in the nature of accounts, contract rights, general intangibles, and goods of a type that are normally used in more than one jurisdiction. 12A P.S. § 9–103(2). The policy of Section 9–102, on the other hand, applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property . . . including . . . instruments . . . " 12A P.S. § 9–102(1)(a). There being no question that the stock pledged in the instant case constitutes an "instrument" within the meaning of Article 9 (see § 9–105(1)(g) and § 8–102(1)(a)) and the stock having been in possession of the plaintiff bank in New Jersey, the applicable Pennsylvania choice of law rule requires this Court to look to the law of New Jersey to resolve the present controversy.

The law governing the merits of this controversy is not quite as clear. The common law rule followed in New Jersey prior to its adoption of the Uniform Commercial Code was set forth in Franklin Trust Co. v. Goerke, 116 N.J.L. 529, 185 A. 39 (1936), as follows:

" ' . . . In the absence of a special agreement, a pledgee is not required, nor can he be compelled, to sell the pledged property and apply the proceeds on the debt before its maturity, even though he has authority to sell and has been requested to do so by the pledgor.' [quoting from 49 Corpus Juris § 98] And . . . 'Although the pledgee, for the pledgor's default, is entitled to sell the collateral, in the absence of a special agreement, he may sell or not at his option, and is under no legal obligation to make a sale, and is not liable for a depreciation in value of the property after the failure to sell; but is liable only for damages resulting from bad faith or negligence.' [quoting from 49 Corpus Juris § 247] The negligence referred to would seem, by the weight of authority, to be negligence in the manner of selling or in the care of the property offered for sale." 185 A. at 40.

Yet while the Supreme Court of New Jersey suggested forty years ago that a pledgee's duty to preserve collateral was solely custodial, that is, limited to the preservation of its physical existence, there is more recent authority holding that the common law duty of a pledgee includes the duty to preserve its value. Grace v. Sterling, Grace & Company, 30 A.D.2d 61, 289 N.Y.S.2d 632 (1968). In addition, it has been held that the same duty of a pledgee to preserve the value of collateral is set forth in Section 9–207(1) of the Code. Reed v. Central National Bank of Alva, 421 F.2d 113 (10 Cir. 1970); Grace v. Sterling, Grace & Company, *supra*. That section provides as follows:

> "(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession.
>
> \* \* \* \* \* \*
>
> (3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest."

Thus, the Court in *Grace, supra,* concluded that:

> "Where commercial paper or other securities are placed in the custody and control of the pledgee, it is clear that his responsibility is not limited solely to the physical preservation of the same. His responsibilities extend to the exercise of such care as a reasonably prudent pledgee would exercise under like circumstances to protect and preserve the validity and value of the securities. This is the rule at common law and also under the Uniform Commercial Code." 289 N.Y.S.2d at 637–638.

 Considering the unnecessary, and sometimes catastrophic, financial losses that a pledgor can be forced to incur by a narrow application of both the Code and common law rules, their interpretation in both *Grace* and *Reed* has substantial merit. The pledgee does not become an insurer of the value of the pledgor's collateral. He must only exercise "such care as a reasonably prudent pledgee would exercise under like circumstances." Obviously, the degree of care required to be exercised will vary considerably under the circumstances. Thus, where the value of the collateral exceeds the amount of the debtor's entire obligation to the secured party there is no justification for a rule authorizing the pledgee to disregard the pledgee's interest in the collateral and deprive him of the right to control its disposition for the benefit of both parties. In such a situation, where a secured party, upon request of the pledgor, fails to take steps to preserve the value of the collateral, a question should properly be raised as to whether the pledgee has exercised reasonable care under the circumstances. On the other hand, where the value of the collateral is less than the amount of the total obligation of the debtor to the secured party, the case is different. In such a situation, the value of the collateral is critically related to the pledgee's security interest and, absent a tender of the deficiency by the pledgor, the pledgee's exclusive right to control the disposition of the collateral is, in itself, reasonable. At the very least, it may provide the only leverage available to encourage the debtor to repay the debt in full. Thus, in the only case that can be found where such a situation was presented, the Court held *as a matter of law* that a bank, as pledgee, could not be said to have failed to have exercised reasonable care to preserve collateral in its custody where it, upon request of the pledgor, refused to liquidate negotiable securities the disposition of which would not satisfy the debt for which they had been pledged to secure. Hutchison v. Southern California First National Bank, 27 Cal.App.3d 572, 103 Cal.Rptr. 816 (1972).

 With regard to the present case, and on the basis of the foregoing discussion, this Court can assume without deciding that the Courts of New Jersey, if presented with the proper case, would interpret Section 9–207(1) of the Uniform Commercial Code to impose upon a

pledgee the duty of exercising reasonable care in the preservation of the value of collateral in his possession. Having made that assumption, the question becomes whether the courts of New Jersey would reach the same result as was reached in Hutchison v. Southern California First National Bank, *supra*. Since the facts of that case are remarkably similar to those of the present and since the result has a sound basis in reason, this Court holds that where the entire obligation of the pledgor exceeds the value of the collateral held by the pledgee, absent some assurance of being paid the entire amount, the pledgee's refusal to sell the collateral upon request of the pledgor would not, as a matter of law, constitute a breach of his duty to preserve its value. The plaintiff's motion for summary judgment will be granted and judgment will be entered accordingly.