DUBMAN, Plaintiff-Appellant, v. NORTH SHORE BANK,
Defendant-Respondent.†

Court of Appeals, District I

*No. 77–564. Argued August 16, 1978.—Decided September 27, 1978.*
(Also reported in 271 N.W.2d 148.)

---

† Petition to review granted.

For the plaintiff-appellant there were briefs by *Weiss, Steuer, Berzowski & Kriger,* with oral argument by *Robert K. Steuer,* of Milwaukee.

For the defendant-respondent, there were briefs by *Kenney, Krembs, Fellows & Wolfe,* with oral argument by *Kenneth M. Kenney,* of Milwaukee.

Before Decker, C.J., Cannon, P.J. and Moser, J.

DECKER, C.J.   In August of 1973, the plaintiff Stanley Dubman was obligated as a borrower and guarantor to defendant North Shore Bank for a number of loans to himself and others.   A substantial portion of the obligations were renewals and refinancings of loans made in a course of dealings with the bank over several decades.   The loans were collateralized with various items ranging from accounts receivable to negotiable securities. A principal item of collateral was 5192 shares of Mortgage Guaranty Investment Corporation stock acquired by Dubman for approximately $5,000.   The per share price of M.G.I.C. dropped from $98 in January 1973 to $79½ on July 31, 1973.

In August, 1973 the plaintiff did not want to sell his stock because of his substantial tax liability on

the capital gain that would result from the sale. Nonetheless, he was concerned about the continued drop in the stocks' market price (then about $70 per share) and he expected it to continue its course (it reached its low of $6⅛ on October 29, 1974). Dubman asked that the stock be released by the bank so that it could be sold "short against the box." Such a sale is a sophisticated and infrequent securities transaction by which one can stabilize the price of a stock and protect against further loss in a market which is trending down.[1] In addition, tax liability is deferred until the short sale is fulfilled by the actual transfer of the securities to the buyer at some indefinite future time or long-term gain tax liability on the stock may be avoided by purchase of substitute stock to fulfill the short sale.

When Dubman made the proposal to the bank for release of the securities to accomplish the sale short against the box, he offered to sign whatever "paper" the bank required. The bank officer with whom he conversed was not familiar with the transaction proposal but learned from Dubman's security broker that only 90 percent of the proceeds of the short sale against the box could be withdrawn from the brokerage house.

Dubman's proposal was rejected by the bank with the explanation that what it would receive in exchange for the stock would be unsatisfactory to keep the loans collateralized. An alternative of paying off all the loans was offered Dubman by the bank.

This action was brought by Dubman to recover approximately $340,000 claimed to be the diminution in market value of his stock by reason of the refusal of the bank to release the stock for the sale short against the box. An alternative cause of action for conversion

---

[1] Because of the view we take, we need not concern ourselves with the rise in the market price of the stock that must precede a sale "short against the box."

was dismissed by Judge Landry when he sustained the bank's demurrer thereto on the ground that it failed to state a cause of action. After trial to the court, Judge Podell dismissed the complaint upon its merits.

We have abbreviated the facts because we believe that this condensed version provides a sufficient context to resolve the issues presented by appellant.

Although Dubman has appealed from the order sustaining the demurrer to the alternative cause of action for conversion and dismissing that cause of action, no argument has been made to this court that the order was erroneous. Our review of the record discloses no basis for recovery upon a theory of conversion. Accordingly, we affirm that order.

This case is controlled by disposition of Dubman's contention that the bank's refusal to accede to the sale short against the box was a violation of its duty to "use reasonable care in the custody and preservation of collateral in [its] possession." Section 409.207 (1), Stats. Dubman argues that the duty prescribed by the statute requires the secured party (the bank) to exercise reasonable care in preserving *the value* of the collateral.

U.C.C. §9–207 (1972 version) (sec. 409.207 (1), Stats.) in substance is a codification of the common law. Professor Gilmore describes the section as a detailed consideration of the rights of pledgors and pledgees[2] "with the evident intent of codifying the common law without substantial change." 2 G. Gilmore, *Security Interests in Personal Property,* §42.1, p. 1128 (1965). The official comment of the U.C.C. Committee regarding §9–207 refers to *Restatement of Security,* §17 and 18 (1941) as authority for the section. Gilmore characterizes those sections of the *Restatement* as "an authoritative state-

---

[2] The common law of pledges is authoritatively and extensively discussed in ch. 15, Brown, *Personal Property,* 2d Ed.

ment of the pre-Code common law" regarding pledges. 2 G. Gilmore, *supra,* §42.1, p. 1129, n. 4.

Comment a. to §17, *Restatement of Security,* p. 65, appears to confine the pledgee's duty of reasonable care in the custody and preservation of collateral to preservation of the physical condition of the collateral. A duty to protect against a decline in value due to fluctuations in the market does not appear to be imposed. Comment a. to §18 states that the pledgee is not liable for a decline in value of collateral even if timely action could have prevented the decline.

Those views are supported by *First Wisconsin National Bank of Milwaukee v. Pierce,* 227 Wis. 581, 278 N.W. 451 (1938). That action was brought to recover on two notes that had been collateralized by Wisconsin Bankshares Corp. stock. The defendant answered and counterclaimed based upon the bank's refusal, prior to maturity of the notes, to permit him to sell the collateral and pay the notes in full, and the bank's further refusal of his alternative request that the stock be sold and the proceeds applied in payment of the notes. The market for the stock fell and the value was insufficient to pay the notes at maturity. On appeal the court held as a matter of law, that a pledgee was not required to sell collateral prior to the maturity of the notes.

Although we have substantial doubts that *Pierce* is a viable precedent, ordinarily we would be constrained to apply that decision. Our doubts about the precedential viability of *Pierce* are grounded in the subsequent development of the common law and the enactment of the Uniform Commercial Code. Assuming, *arguendo,* a general principle that a secured party under the Code may become liable for a failure to preserve the value of the collateral, we believe its application to the context of this case would not afford relief to Dubman. For that rea-

son we proceed to a further discussion of Dubman's contentions.

Although the comments to the Uniform Commercial Code and the Restatement of Security suggest that the common law of pledges, as restated and codified in those compilations, limited the rule of reasonable care in the preservation of the collateral to physical care as distinguished from value, case law has in fact applied the rule more broadly. Thus the duty to insure against loss or destruction, to present an instrument for acceptance or payment, and to exercise stock warrants or to respond to convertibility provisions, has evolved from the application of the rule of reasonable care owed to a pledgee of collateral.

Dubman urges that the reasonable care rule requires a secured party under the Code to protect the debtor against a decline in value of the collateral. In support of his position he relies upon *Grace v. Sterling, Grace & Co.*, 30 App. Div. 61, 289 N.Y.S.2d 632 (1968) ; *Reed v. Central National Bank of Alva*, 421 F.2d 113 (10th Cir. 1970) ; *Fidelity Bank & Trust Co. of N. J. v. Production Metals Corp.*, 366 F. Supp. 613 (E.D. Pa. 1973) ; *Hutchison v. Southern California National Bank*, 27 Cal. App.3d 572, 103 Cal. Rptr. 816 (1972) ; *Traverse v. Liberty Bank & Trust Co.*, 5 U.C.C. Rep. Serv. 535 (Mass. Superior Ct. 1967) ; and *Tallahassee Bank & Trust Co. v. Bryant*, 271 So.2d 190 (Fla. 1972).

The assertion made in *Grace, supra,* that §9–207 of the U.C.C. requires reasonable care by the secured party to preserve the value of the collateral is without citation of authority and a misstatement of pre-Code common law. *Reed, supra,* "assumes without deciding" that there is a duty to preserve the value of the collateral. *Traverse, supra,* did not expressly find that the pledgee's duty was

to preserve value. *Tallahassee, supra,* refers to *Grace* but does not rely upon it.

If the statement in *Grace* that the secured party has a duty of reasonable care in preserving the value of the collateral is intended to summarize the pre-Code law, it is in error. If the statement is an expanded duty arrived at by interpretation of the Uniform Commercial Code, it is unsupported by reasoning or reference to provisions of the Code.

None of the cases relied upon by Dubman *applied* a rule that a secured party was liable for a decline in market value of securities held as collateral after refusal of a demand by a debtor to sell *unless* the sale value of the securities was sufficient to pay the debt in full and was tendered by the debtor. Although a concept was advanced in *Fidelity* that a pledgee was liable for a decline in value after a debtor's demand for sale of the collateral, the actual decision of the court on the facts involved was:

> [T]his court holds that where the entire obligation of the pledgor exceeds the value of the collateral held by the pledgee, absent some assurance of being paid the entire amount, the pledgee's refusal to sell the collateral upon request of the pledgor would not, as a matter of law, constitute a breach of his duty to preserve its value. (p. 619)

The court found that upon the facts in that case the sale of the collateral would not have paid the debt. Because of an absence of New Jersey case law, the federal judge attempted to discern New Jersey law in his decision in *Fidelity*. Subsequently, in *New Jersey Bank v. Toffler,* 139 N.J. Super. 161, 353 A.2d 116 (1976), the question was resolved:

> We conclude that our law does not hold a pledgee responsible for a decline in market value of securities

pledged to it as collateral for a loan absent a showing of bad faith or a negligent refusal to sell after demand. (p. 118)

There is no evidence in the record that in our view justifies a finding of bad faith or negligence by the bank.

If a rule such as that urged by Dubman was adopted, how would it apply to the facts in this case?

The sale of the M. G. I. C. stock would not have provided sufficient cash, even if made on and immediately after August 13, 1973, when Dubman insists he made the request, to pay in full the loans upon which Dubman was obligated. The rule actually applied in the cases relied upon by the appellant would be inoperative.

However, Dubman contends, contrary to the finding of the trial court, that the available proceeds (90 percent) of the projected sale price *together with* the other collateral held by the bank would have maintained for the bank an equivalent secured position. For the purpose of refuting his argument, we disregard the contrary finding of the trial court.

The evidence does not establish that Dubman offered to apply 90 percent of the proposed sale short against the box proceeds to reduction of the debt. Even if the debt was reduced accordingly, he would have successfully forced upon the bank a reliance upon a part of the collateral originally held for a part of the original debt. In that manner he would have compelled an involuntary change in the loan and pledge agreement.

The evidence does not establish that Dubman offered to have the bank hold the available cash proceeds of the sale in an account with the bank as collateral for the loans. Even if the proceeds were held as collateral, they would be but 90 percent of the originally held collateral. Although hindsight provides a view of the drastic reduction in market value of the stock, it also affords a view of the stock's partial recovery from its October, 1974 low.

When the loans were made and the collateral pledged, the bank discounted the value of the stock about one-third to loan value as a hedge against the risk of a decline in market value of the collateral. However, it also undertook the risk that the decline in value would be greater than that discounted and the risk that the debtor would be unable to repay the loan or deposit more collateral. If the debtor feared a near term decline in the value of pledged stock he could force a division of the loan agreement possibly withdrawing the collateral with the greatest prospect of appreciation during the term of the lending agreement and compelling the unpaid balance of the loan to be secured by collateral of lesser quality.

Thus increased risks to the secured party would be without reward, for the appreciation in value of the securities inures solely to the debtor.

We conclude that the debtor's tender of less than the total proceeds of the sale of collateral, as a matter of law, justifies a secured party's refusal to release pledged securities for sale. We also believe that a demand for a release of a portion of collateral even though the total proceeds are applied in part payment of the loan may be justifiably refused unless the remaining collateral is of a kind and quality equal or superior to that sold and valued in an amount sufficient to meet the collateral requirements of the loan balance.

Our review of the record, drawing conclusions and inferences from the facts most favorable to Dubman, establishes no merit to his cause. In our review we have departed from the ordinary standard for review, *In re Estate of Taylor,* 81 Wis.2d 687, 696, 260 N.W.2d 803 (1977), so that we might address ourselves to the legal principle urged by Dubman. We take that course because of our doubts about the viability of *Pierce* as a precedent.

The trial judges' conclusions that Dubman's proposal for the disposition of the M. G. I. C. stock and the application of the proceeds was unreasonable and that the bank's refusal to consent to the proposal was reasonable are suppported by the evidence. We agree with those conclusions.

*By the Court.*—Affirmed.