DUBMAN, Plaintiff-Appellant, v. NORTH SHORE BANK, Defendant-Respondent.†

Supreme Court

*No. 77–564. Argued May 1, 1979.—*
*Decided June 12, 1979.*
(Also reported in 279 N.W.2d 455.)

† Motion for reconsideration denied, with costs, on July 30, 1979.

For the appellant there were briefs by *Robert K. Steuer* and *Weiss, Steuer, Berzowski & Kriger* of Milwaukee, and oral argument by *Robert K. Steuer* and *Scott B. Fleming.*

For the respondent there was a brief by *Kenneth M. Kenney* and *Kenney, Krembs, Fellows & Wolfe* of Milwaukee, and oral argument by *Kenneth M. Kenney.*

DAY, J.   This case comes to the court on a petition to review a decision of the Court of Appeals. *Dubman v. North Shore Bank,* 85 Wis.2d 819, 271 N.W.2d 148 (1978). The Court of Appeals affirmed the judgment of the Circuit Court for Milwaukee County, the Honorable Ralph J. Podell, presiding, in which it was determined that the defendant North Shore Bank did not act unreasonably when it refused to consent to a transaction proposed by the plaintiff Stanley Dubman to release shares of stock pledged as collateral in order that Dubman could sell them "short against the box." The Court of Appeals also affirmed an order by the Circuit Court for Milwaukee County, the Honorable Robert Landry, presiding, sustaining a demurrer to an alternative cause of action for conversion. Mr. Dubman does not argue the demurrer in his brief to this court and we therefore affirm the decision and order on demurrer.

The question is:

DID THE BANK AS SECURED PARTY VIOLATE THE DUTY IMPOSED BY SEC. 409.207, STATS. (1973) TO USE REASONABLE CARE IN THE CUSTODY AND PRESERVATION OF COLLATERAL IN ITS POSSESSION WHEN IT REFUSED TO RELEASE STOCK PLEDGED AS COLLATERAL TO ENABLE THE DEBTOR TO TRANSACT A "SHORT SALE AGAINST THE BOX?"

Stanley Dubman brought this action to recover damages from the North Shore Bank for its alleged failure

to preserve the value of 5,192 shares of common stock of Mortgage Guaranty Insurance Corporation (MGIC) which were pledged as security for loans made to Mr. Dubman by the bank.

Stanley Dubman and his brother Harold are owners and operators of men's and women's clothing shops known as Harley's, Inc. and Harley's Casuals. They had done their banking with the North Shore Bank from 1948 to 1976. In August, 1973, Stanley Dubman was obligated to the bank as borrower and guarantor on ten loans totaling $408,000. The loans in large measure were the result of renewals and refinancings which reflected twenty-five years of business dealings between the parties. The loans were secured by various items of collateral, including accounts receivable and negotiable securities. As of August 22, 1973, the bank ascribed loan value of $336,909.86 to these items of collateral. However, the record shows that the items of collateral to which the bank ascribed loan value totaled $431,246.

One of the items of collateral was a block of 5,192 shares of Mortgage Guaranty Insurance Corporation (MGIC) stock. Mr. Dubman had acquired the stock at a very low cost basis. The shares began to fall from a peak of more than $98 in January, 1973 to $79 on July 31, 1973. The stock ultimately hit a low of $6\frac{1}{8}$ on October 29, 1974. Mr. Dubman testified that he was concerned about preserving the value of his collateral, but he did not wish to sell the stock outright because he would face substantial tax liability on the resulting capital gain. He testified that he approached the North Shore Bank with a proposal that they release the stock so that he could sell it "short against the box" on August 13, 1973, when the stock was trading at $71\frac{7}{8}$. However, the trial court found that the initial contact took place on August 22, 1973. This finding was not against the great weight

and clear preponderance of the evidence, since it was supported by testimony that the bank officer approached by Dubman was out of town on August 13, 1973. This court is therefore bound by that finding. On August 22, 1973, the stock was trading at sixty-three dollars per share.

The evidence at trial established that a short sale against the box is a securities transaction by which the owner may hedge against a downward trend in a stock. To accomplish such a sale, a brokerage house must have physical possession of the shares in negotiable form, which are placed in a margin account. The broker sells an equivalent number of shares. Ultimately, the short sale against the box must be covered either by the original shares or by buying shares in the open market. The effect of the short sale against the box is to lock the owner into the price at the time the transaction was set up. In order to effect a short sale against the box, there must be an "up-tick" of the market which means that the stock must rise in price by at least ⅛ of a point per share above the designated price. A short sale against the box allows the owner to defer income tax liability until the transaction is finally completed with the release of the original shares or the delivery of newly purchased shares. Up to ninety percent of the proceeds of a short sale against the box can be drawn from the account by the owner, in what amounts to a loan from the broker. The owner is obliged to pay interest on that portion which is withdrawn until the transaction is completely covered and the margin account for that particular stock is eliminated.

In its memorandum decision the trial court said:

". . . MGIC stock, on August 13, 1973, was selling at 71⅞. The only time when MGIC stock sold for more than 71⅞, which it attained on August 13, 1973, was on August 14, 15 and 16, 1973. Therefore, the placing of an

order to sell short against the box after August 16, 1973 could never thereafter have been consummated."

The plaintiff, Mr. Dubman testified he talked to Paul Rosenheimer, President of the Bank on August 13, 1973 about obtaining the shares of MGIC for a sale short against the box and offered to pay off his personal loan of $52,000, and that he would purchase certificates of deposit or deposit in a savings account the ninety percent of the sale price he could borrow from the broker in the sale against the box.

Mr. Rosenheimer on the contrary testified that on August 13, 1973, he was in Madison, Wisconsin attending a graduate school of banking course. He testified that his first conversation with Mr. Dubman was on August 22, 1973. He said he told Mr. Dubman that the bank would not release the stock unless the loans were all paid up. Mr. Rosenheimer denied that Mr. Dubman ever told him that ninety percent of the stock sale proceeds would be borrowed from the broker and paid to the bank.

The trial court found that the original conversation between Rosenheimer and Mr. Dubman took place on August 22, 1973 and not on August 13, 1973. The court noted that Mr. Rosenheimer said that on September 11, 1973, he spoke with Mr.Dubman. It was mentioned that MGIC was at 53. Mr. Dubman said he was going to hold the Bank responsible for the loss in value because the stock was at 63 when the matter was originally discussed. MGIC was at 63 on August 22, 1973, not on August 13. Thus, the finding by the trial court that the conversation took place on August 22, 1973 was not against the great weight and clear preponderance of the evidence.

Mr. Dubman contends that the Bank's refusal to release the stock to permit the short sale against the box was a violation of its duty of reasonable care imposed by sec. 409.207 (1), Stats., (1973) :

"409.207. *Rights And Duties When Collateral Is In Secured Party's Possession.* (1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed."

The Official UCC Comment to 9–207 (1) provides that "Subsection (1) states the duty to preserve collateral imposed on a pledgee at common law. See Restatement Of Security, Secs. 17, 18. . . ." [1]

The comment to Sec. 18 of the Restatement of Security states, "The pledgee is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such a decline."

However, courts have not construed the requirements of UCC 9–207 so narrowly. In *Grace v. Sterling, Grace & Company,* 30 App. Div.2d 61, 64, 289 N.Y.S.2d 632, 637 (1968), the court stated

"Where commercial paper or other securities are placed in the custody and control of the pledgee, it is clear that his responsibility is not limited solely to the physical preservation of the same. His responsibilities extend to the exercise of such care as a reasonably prudent pledgee would exercise under like circumstances to protect and preserve the validity of the securities."

The *Grace* case involved an action to recover damages for the loss sustained by the owner of convertible deben-

---

[1] "Sec. 17. *Pledgee's Duty Of Reasonable Care.* The pledgee owes to the pledgor the duty of reasonable care of the pledged chattel except where the chattel is in the possession of a third person designated by the pledgor or is in the possession of the pledgor himself.

"Sec. 18. *Pledgee's Duty To Collect Instruments.* Where instruments representing claims of the pledgor against third persons are pledged, the pledgee has the duty of using reasonable diligence to preserve and collect the claims or to enable the pledgor to undertake such preservation and collection."

tures when the repledgee failed to convert them into stock prior to their redemption date. If the debentures had been converted to stock in accordance with the conversion privileges, the plaintiff would have received stock valued on the market at nearly twice the face value of the debentures. However, the custodian of the debentures made no response to the conversion notice given by the issuer of the debentures. In that case, the court held that issues of negligence of the custodian of the debentures and the plaintiff's contributory negligence involved the application of a broad standard of reasonableness, and should be resolved by the trier of fact.

Similarly, in *Reed v. Central National Bank of Alva,* 421 F.2d 113 (10th Cir. 1970), involving the failure of a pledgee to respond to a redemption call to convert debentures into stock, the court stated that the question was whether the bank had used reasonable care

"The first sentence of sec. 9–207(1) requires a secured party to 'use reasonable care in the custody and preservation of collateral in his possession.' In agreement with *Grace,* we believe that the word 'preservation' includes preservation of value." *Id.* at 117.

*Accord, Traverse v. Liberty Bank & Trust Co.,* 5 UCC Reporting Service 535 (Mass. Sup. Ct. 1967).

In *Tallahassee Bank & Trust Co. v. Bryant,* 271 So.2d 190 (Fla. App. 1972), the court held that in an action against a bank for loss resulting from the expiration of warrants to purchase stock while the warrants were in the bank's vault as security for a loan, the questions of the Bank's negligence and the owner's contributory negligence were jury questions. The court pointed out that the UCC does not cast an absolute duty on the bank. Rather the standard of care is one consistent with the general principles of the law of negligence. *Id.* at 193.

The debenture and stock warrant cases are distinguishable in that the secured party was charged with notice

when it accepted the collateral that its value was, at least in part, dependent upon the happening of a future event. Closer factually to the instant case is *Hutchison v. Southern California First Nat. Bank,* 27 Cal. App.3d 572, 103 Cal. Rptr. 816 (1972). In that case, the pledgors of a stock also sued the Bank for damages allegedly sustained when the Bank breached its duty to preserve the value of collateral. The Bank refused to consent to a transaction to sell call options to purchase 20,000 shares of the pledged stock, and also to sell another 20,000 shares of the pledged stock short against the box. The court applied a number of alternative theories in sustaining demurrers to the plaintiffs' cause of action. The court pointed out, *inter alia,* that the plaintiffs had failed to adequately allege causation between the bank's refusal to consent to the transaction and the claimed damages.

The trial court pointed out in its memorandum decision that nothing in the record establishes that Mr. Dubman would have gained any ultimate tax advantage even if such short sale against the box had been made. The trial court pointed out, as established by the record, a short sale against the box is a rather rare and unusual transaction. Mr. Dubman's broker, Robert M. Schneider, was not sufficiently knowledgeable to outline all of the details and testified, as he had informed Paul Rosenheimer, that the accounting or operations department of Loewi and Company knew the details and that he himself was not sure of the "fine" mechanics of such a transaction since it was not a frequent one. No one from Loewi's accounting or operations department ever contacted anyone connected with the bank to explain the details nor did Mr. Dubman ever finalize his dealings with the broker so that a definite proposal could have been submitted to the Bank. The court further pointed out that Mr. Dubman's expert in the commercial financing field, Mr. Lawrence Appel, had never handled such

a transaction. The record showed that all of the Bank's officers all of whom had experience in the banking field had no knowledge of such a sale. Mr. Asher Nichols, an executive of one of Milwaukee's largest banks, testified that he was without knowledge of this particular type of transaction.

As the trial court pointed out, Mr. Dubman testified that he obtained his information from conversations with brokers who came into his store but he could not recall their names. It was Mr. Dubman's demand in his first conversation with Paul Rosenheimer that he wanted the stock released that day. We agree with the trial court, "such a request, we find to be extremely unreasonable under all the circumstances . . ." The trial court also concluded that the testimony of the Bank's officers was more credible than that of Mr. Dubman. The court in its findings of fact found that the plaintiff, Mr. Dubman, did not offer to obtain a loan of ninety percent of the proceeds of such sale short against the box and to pay off his personal loans therefrom, to purchase certificates of deposit, or deposit the money in a savings account and give it to the Bank as substitute collateral.

We agree with the trial court's conclusion:

"Where the plaintiff failed to suggest a program which would afford the defendant adequate security, and further failed to offer to pay any expenses incurred by the defendant in seeking outside assistance for the formulation of a program which would protect the defendant in its position as a secured lender, plus the plaintiff's insistence for immediate release of said pledged stock, the plaintiff sought to impose upon the defendant a burden far in excess of any obligation which the defendant owed to the plaintiff."

This court would agree that the Bank had a duty to act reasonably to preserve the value of collateral. However, the defining of the scope of that duty is best left

to a more appropriate case. It is clear that the Bank was not required to consent to a short sale against the box to minimize Mr. Dubman's tax liability. The evidence showed that the Bank presented Mr. Dubman with alternatives. There was testimony that the Bank would have permitted Mr. Dubman to sell the stock outright to pay off his obligations. This alternative was not acceptable to Mr. Dubman who wished to defer paying a capital gains tax on the sale of the shares. It was his decision to hold onto the shares.

There is nothing in the facts in this case as found by the trial court and amply substantiated in the record that required the Bank, under any theory of duty to preserve the value of collateral, to acquiesce in the demands made in this case by Mr. Dubman.

The trial court properly dismissed Mr. Dubman's complaint upon its merits.

*By the Court.*—The decision of the Court of Appeals affirming the judgment and order is affirmed.

Coffey, J., took no part.

The following memorandum was filed August 28, 1979.

PER CURIAM.    (On motion for reconsideration).
On page 234 of our original opinion it is stated that:

"Mr. Asher Nichols, an executive of one of Milwaukee's largest banks, testified that he was without knowledge of this particular type of transaction."

This sentence is withdrawn.
Motion for reconsideration denied without costs.

COFFEY, J., took no part.