In re Joseph R. SOLFANELLI
and Natalie G. Solfanelli,
his wife, Debtors.

Joseph R. SOLFANELLI and Natalie
G. Solfanelli, his wife, Plaintiffs,

v.

MERIDIAN BANK and Stevens and Lee,
a Professional Corporation,
Defendants.

Bankruptcy No. 5–90–01120.
Adv. No. 5–92–0013.

United States Bankruptcy Court,
M.D. Pennsylvania.

Dec. 13, 1996.

Order for Judgment Dec. 10, 1996.

700

Edward Mannino, Philadelphia, PA, for Joseph R. Solfanelli, Debtor/Plaintiff.

John Doran, Wilkes–Barre, PA, for Natalie G. Solfanelli, Debtor/Plaintiff.

Joan Sheak, Allentown, PA, for Meridian Bank/Defendant.

## OPINION

JOHN J. THOMAS, Bankruptcy Judge.

Joseph and Natalie Solfanelli, together with Carmen Tomaine, were indebted to Meridian Bank ("Bank") in the approximate amount of $4.8 million dollars when the Solfanellis filed for bankruptcy under the provisions of Chapter 11 of the United States Bankruptcy Code on October 12, 1990.

At the time of filing, the Bank had as collateral for this debt, some real estate, but more importantly, a significant number of the shares of First Eastern Bank, N.A., then in the name of the Debtor, Joseph R. Solfanelli. Those shares numbered 206,254 on the filing date. (Plaintiffs' Exhibit 41 at p. 4.)

Confronted with a motion to lift the automatic stay filed by the Bank, the Solfanellis and the Bank entered into a Stipulation and Security Agreement, ("Stipulation"), which Stipulation was approved by the bankruptcy court on January 22, 1991. (Plaintiffs' Exhibit 41.)

Thereafter, the Stipulation governed the rather rocky relationship between the parties, a relationship which culminated in the filing of this litigation.

The Plaintiffs' complaint was originally filed on February 27, 1992 to the above adversary number. An amended complaint was filed on March 24, 1992, and that complaint included the following Counts.

Count I Violation of the Stay

Count II Abuse of Process

Count III Request for Punitive Damages

Count IV Request to Void the Release

Count V Misrepresentation and Fraud

Count VI Conspiracy

Count VII Violation of 9504 of the Uniform Commercial Code and Rule 10(b) of the Securities and (sic) Exchange Act of 1934 as amended

By agreement, Joseph Solfanelli has waived his claims for damages on Counts I through IV. (Transcript of 01/09/95 at 10.)

The Plaintiffs have settled their claim against Defendant, Stevens and Lee, who were then dropped from the litigation. The trial of the entire complaint appeared to involve a significant investment of court time. Therefore, on July 5, 1994, on motion of the Plaintiffs, the court granted a request to bifurcate the trial into a litigation of Counts I, II, III, IV and VII, with Counts V and VI being deferred to a later time. The initial litigation of the five Counts took four trial days.

In reviewing the various issues ripe for adjudication, we will address them in seriatim fashion.

### Count I—Violation of the Automatic Stay

On October 10, 1990, the Defendant, Meridian Bank, confessed judgment against the Plaintiffs. The Bank executed on various accounts maintained by the Debtors. On October 12, 1990, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code. On October 23, 1990, the Bank filed a motion for relief which resulted in the Stipulation of December 27, 1990. That Stipulation and Security Agreement was approved by the court on January 22, 1991.

Under the terms of that Stipulation and, specifically at paragraph 2 on page 5, the Debtors were authorized to use cash collateral "in the ordinary course of their businesses and for ordinary and customary living expenses...." The evidence indicates that the accounts were so used and, in fact, not only were checks written on the accounts, but deposits were also made.

Determining that the Stipulation was breached by the Debtors, the Bank declared a default in its terms on March 18, 1991. While some details are disputed, it is acknowledged that the Bank garnished various pre-petition accounts including accounts which contained post-petition funds of the Debtors-in-Possession on February 10, 1992. The Bank asserts that pursuant to paragraph 12 of the Stipulation, it was immediately

entitled to relief from the automatic stay upon default.

Count I of the complaint argues that this action was a violation of the automatic stay and requires the Debtors to be compensated.

■ Regardless of whether the Bank properly declared a default in the terms of the Stipulation and Security Agreement, we reject the proposition that a pre-petition lien extends to post-petition deposits absent a replacement lien. *In re New York City Shoes, Inc.,* 78 B.R. 426, 432 (Bankr.E.D.Pa. 1987). There was no evidence within the Stipulation and Security Agreement that a replacement lien was granted. The Bank's authority, at best, extended to the encumbered funds that existed in the account at the time of the original garnishment on October 10, 1990 and remained in these accounts through February 10, 1992.

Having found a violation, we turn to 11 U.S.C. § 362(h) to determine our responsibility relative to such violation. Section 362(h) reads as follows:

> (h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

■ As we had discussed in *In re Micro Marketing International, Inc.,* 150 B.R. 573 (Bankr.M.D.Pa.1992), no award of damages including attorneys' fees can be entered without some evidence that actual damages were incurred. Mrs. Solfanelli presented no evidence of monetary damages. Nevertheless, we find that her testimony was sufficient for this court to establish the existence of embarrassment, humiliation, and mental anguish. She had no reason to believe, even upon default, that her post-petition deposits would be at risk without notice to her. When those deposits did not support the checks written against them because the funds had been removed, she was understandably embarrassed. While we all suffer humiliation and embarrassment at various stages of our life, a finding that this was caused by the Bank's violation of the automatic stay is sufficient to support an award

under 11 U.S.C. § 362(h). *Mercer v. D.E.F., Inc.,* 48 B.R. 562, 565 (Bankr.D.Minn.1985); *In re Wagner,* 74 B.R. 898, 905 (Bankr. E.D.Pa.1987); *In re Clark,* 96 B.R. 569, 579 (Bankr.E.D.Pa.1989). *See also* Restatement (Second) of Torts § 905 (1979).

What we are not free to do, however, is to speculate about the measure of those damages. While the aforecited courts have awarded various dollar amounts ranging from $100 to $2000 for such degradation, I am extremely uncomfortable in pulling some number out of the air and suggesting that it is a fair measure of *compensatory* damages. Suffice it to say that we are satisfied to award nominal damages in the amount of $1.00 in favor of Natalie G. Solfanelli and against Meridian Bank for this violation. Having done that, we are free to further award attorneys' fees in advancing this litigation as it relates to the violation of the automatic stay and will direct Debtors' counsel to file an itemization of same within thirty (30) days.

An award of punitive damages is also a possibility under the provisions of 11 U.S.C. § 362(h) and I will so consider that in my discussion of Count III of Plaintiffs' complaint.

### Count II—Abuse of Process

■ The Plaintiffs maintain that the Bank's action in executing upon post-petition accounts was an abuse of process by the Bank. The Plaintiffs demand damages for such action.

■ "The gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it." *Hart v. O'Malley,* 436 Pa.Super. 151, 647 A.2d 542, 546 (1994) *citing Mayer v. Walter,* 64 Pa. 283 (1870). Its "touchstone" is a use of process for a purpose for which it was not intended. *Neill v. Eberle,* 153 Pa.Cmwlth. 181, 620 A.2d 673, 674 (1993). While there is no cause of action for abuse of process if the claimant, even with bad intentions, merely carries out the process to its authorized conclusion, abuse of process usually pertains to situations involving "extortion by means of attachment, execution or garnishment...."

*Cameron v. Graphic Management Associates, Inc.*, 817 F.Supp. 19, 21 (E.D.Pa.1992) *citing Zappala v. Hub Foods, Inc.*, 683 F.Supp. 127, 129 (W.D.Pa.1988) (quoting W. Prosser & W. Keeton, *Prosser and Keeton on Torts* § 121 (5th ed. 1984)).

■ "A cause of action for abuse of process requires '[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process.'" *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 237, 582 A.2d 27, 32 (1990), *allocatur denied*, 527 Pa. 636, 592 A.2d 1303 (1991) *citing Shaffer v. Stewart*, 326 Pa.Super. 135, 139, 473 A.2d 1017, 1019 (1984).

An example of an abuse of process can be found in the comments to § 682 of the Restatement (Second) of Torts as follows:

> 1. A, the master and owner of a vessel, mortgages it to B, with a stipulation that A shall retain the possession of the vessel and make voyages in it. In order to compel A to give up the register of his vessel, to which B was not entitled under the terms of the mortgage, B causes a capias to issue in an action to recover the amount loaned, knowing that A cannot pay the money or obtain bail. A is arrested under capias and kept in prison until he gives up the register, his lack of which prevents him from making several profitable voyages. B is subject to liability to A for abuse of process, although the proceedings have not terminated in A's favor and irrespective of whether B has probable cause for the action in which the capias was issued.
>
> Restatement (Second) of Torts § 682 cmt. a, illus. 1 (1977).

Using this illustration as guidance, it is apparent that the process in this case, the garnishment, was utilized to effect an attachment of post-petition funds. That was a purpose unauthorized by any of the documents presented at trial.

"The gravamen of the misconduct for which the liability stated in this Section is imposed is ... the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." Restatement (Second) of Torts § 682 cmt. a. (1977).

Based upon this reasoning, the court is satisfied that these facts subject the Bank to liability. The damages caused by such tort are adequately addressed in our discussions of Count I and Count III.

### Count III—Punitive Damages for Violation of the Stay

11 U.S.C. § 362(h) reads as follows: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
>
> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.
>
> Restatement (Second) of Torts § 908 (1979).

■ Whether the facts of this case represent an appropriate circumstance for the imposition of punitive damages turns on the following factors that have been culled from the Restatement and the case of *In re M.J. Shoearama, Inc.*, 137 B.R. 182, 190 (Bankr. W.D.Pa.1992) *citing In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 487 (Bankr. E.D.Pa.1989).

> (1) the nature of the offending party's conduct;
>
> (2) the nature and extent of the harm to the plaintiff;
>
> (3) the nature and extent of the harm the offending party intended to cause;
>
> (4) any provocation by the debtor; and

(5) the offending party's ability to pay damages.

While the violation of the stay was willful as that term is understood in our circuit[1], some analysis of the facts are necessary before I can conclude that it was so flagrant as to warrant punitive damages.

The garnishment of the bank accounts originally occurred prior to the bankruptcy. The Stipulation and Security Agreement entered into between the parties was designed to resolve the post-petition relief motion filed by the Bank. As the reader will later in this opinion learn, the Certificate of Default declared by the Bank was initially properly filed and, therefore, terminated the automatic stay. The further garnishment of the accounts were, thus, appropriately performed with the exception of the funds that were placed in those accounts post-petition. While that may have been a simple oversight if occasioned by an inexperienced attorney, Bank counsel, in this case, was exceptionally knowledgeable of the bankruptcy provisions. That is not to say that said counsel acted maliciously in pursuing these post-petition funds. On the contrary, there is absolutely no evidence that the Bank was anything but overzealous, though negligent, in sweeping the accounts. Still, such disregard is sufficient to support an award of punitive damages.

I have examined the record in support of Counts I and II to determine the extent of the harm caused by the Bank's conduct and have found none but nominal damages to exist. Nevertheless, that is not a bar to an award of punitive damages. Restatement (Second) of Torts § 908, cmt. c (1979).

While there were some suggestions in both the pleadings and the trial that the Bank's conduct against the Solfanellis was not purely motivated by a desire to liquidate the indebtedness, those "suggestions" did not approach evidentiary value. I therefore conclude that the Bank's motivation in garnishing the post-petition funds was free from malice.

As to whether the Plaintiffs "provoked" the Bank into taking the post-petition funds, we can only observe that the existence of a material default in February, 1992, could certainly be called a "provocation." Nevertheless, there is absolutely nothing in the Plaintiffs' conduct, as evidenced by this record, that would justify the Bank's disregard of the automatic stay as it pertains to the post-petition funds.

As to the Bank's ability to pay damages, this record is sufficient to make a finding that Meridian Bank can afford such an adjudication. (Transcript of 01/09/95 at 138.)

It is important to point out, however, that not only have I found that there was a nominal amount of actual damages, but I have not been made aware of the extent to which the funds were frozen and/or actually removed from the accounts. While a suitable punishment of the Bank is in order for their indifference, I will conclude that any sum in excess of $10,000 would be disproportionate to the severity of the harm, and any sum less would depreciate the sanctity of the automatic stay. I, therefore, award the sum of $10,-000 in favor of Natalie Solfanelli where, as here, the monetary value of the non-economic harm is difficult to determine. *BMW of North America, Inc. v. Gore*, —— U.S. ——, ——, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996).

### *Count IV—Request to Void the Release*

The Plaintiffs/Debtors argue that the release executed by the Debtors and attached to the Stipulation and Security Agreement is void since the Bank has "materially breached its obligations under the Stipulation and Security Agreement." (Amended Complaint filed 03/24/92 at ¶ 25.)

In their proposed findings of fact filed May 30, 1995, the Plaintiffs advance four (4) occurrences when the Bank breached the Stipulation. Those four (4) are identified as follows:

(1) Meridian Bank improperly filed a Certificate of Default on March 18, 1991, because Plaintiffs complied with the Stipulation and Security Agreement regarding the sale of Joseph Solfanelli's cellular telephone interest.

---

1. *In re Atlantic Business and Community Corp.,* 901 F.2d 325 (3d Cir.1990).

(2) Meridian improperly refused to withdraw the judgment against Natalie Solfanelli and consent to dismissal of the Chapter 11 proceeding against Natalie Solfanelli.

(3) Meridian Bank improperly garnished Plaintiffs' bank accounts which contained post-petition earnings in February, 1992.

(4) Meridian's garnishment of Plaintiffs' bank accounts in February 1992 caused injury to Natalie Solfanelli.

### (1) Certificate of Default

■ The Plaintiffs maintain that the Bank's Certificate of Default on March 18, 1991 was improperly filed. This Certificate of Default recites in paragraph 3 the reasons why default is being declared. It states as follows:

3. Debtor is in default of the following provisions of the Stipulation:

(a) Paragraph 8(a)—Payment of February interest to Meridian Bank;

(b) Paragraph 8(a)—Payment of March interest to Meridian Bank; and

(c) Paragraph 6(*l*)—Debtor, Joseph R. Solfanelli, failed to sell his limited partnership interest of the Cellular Company on or before March 15, 1991 and to pay net proceeds therefrom of at least $300,-000 to Meridian Bank.

(Plaintiffs' Exhibit 89.)

While the Plaintiffs have focused on their dispute with the Bank as to whether the liquidation of Joseph Solfanelli's interest in the cellular company complied with the letter of the Stipulation, the Plaintiffs have not disputed that interest for February and March were unpaid to the Bank.

Our analysis of whether the Debtor, Joseph R. Solfanelli, "failed to sell his limited partnership interest of the Cellular Company on or before March 15, 1991 and to pay net proceeds therefrom of at least $300,000 to Meridian Bank" begins with the Stipulation.

There are two paragraphs in the Stipulation that deal with Solfanelli's interest in the cellular company. Paragraph 6(*l*) states as follows: "Debtor Joseph R. Solfanelli shall sell his limited partnership interest of the Cellular Company on or before March 15,

1991, for an amount that will yield net proceeds of at least $300,000.00."

Paragraph 8(e)(ii) indicates: "Debtors shall pay to Bank, immediately upon receipt, the following: ... All proceeds from the sale of Debtor Joseph R. Solfanelli's limited partnership interest in the Cellular Company; . . . ."

Whether Solfanelli sold his interest in the company on or before March 15, 1991 was one of the factual issues raised at the time of trial. It is not disputed that the time deadline for selling this interest was the subject of some discussion between Solfanelli and the Bank, which discussion culminated in a refusal by the Bank to amend this requirement. See correspondence from Bank counsel at Plaintiffs' Exhibit 76. The refusal to amend motivated a response by Mr. Solfanelli to the effect that, for technical reasons, the buyer would be unable to close until March 22, 1991. (Plaintiffs' Exhibit 77.) Defendant's counsel then responded by letter of March 18, 1991 which enclosed the Certificate of Default but also indicated that the Bank would forbear until March 22, 1991. Bank's counsel further stated, "If Joe Solfanelli has not sold his interest in the Cellular Company and paid $300,000 to Meridian Bank by 2:00 P.M. on Friday, March 22, 1991, Meridian Bank will no longer refrain from taking further action." (Plaintiffs' Exhibit 78.)

Although there were later attempts to modify the payment date, the cellular company was, in fact, sold and the Bank was paid on March 22, 1991. (Plaintiffs' Exhibit 83.)

It is at this point that some confusion reigns.

Richard Fehling, counsel for Meridian, while enclosing a copy of the executed Certificate of Default in his correspondence of March 18, 1991, (Plaintiffs' Exhibit 78), indicated that if the cellular company was not sold and the Bank paid by March 22, 1991, "Meridian Bank will no longer refrain from taking further action." This was stated without any indication of what the Bank would do if, in fact, that condition was met. Will it still no longer refrain from taking further action? Would it continue to refrain until such time as the court authorized it not to?

Would it refrain for twenty-four hours, thirty days, or one year?

It remains for the court to determine the extent to which, if any, this letter modified the terms of the Stipulation and Security Agreement of December 27, 1990. Whether or not the event of default remained is apparently a central controversy. (Plaintiffs' Exhibit 83.)

A review of the record compels the conclusion that the sale of the cellular telephone interest did not, in fact, take place by March 15, 1991 and, therefore, the Bank was justified in certifying default in the terms of the Stipulation on March 18, 1991. I find, however, that the Fehling letter of March 18, 1991 contained terms which would allow for prompt "cure" of the default.

Moreover, delinquent interest payments for February and March, identified as two additional reasons for the Certificate of Default filed March 18, 1991, were apparently paid from the proceeds of the sale of the cellular company. (Plaintiffs' Exhibit 84.) Therefore, as of March 22, 1991, all outstanding events of default were cured. What effect does this have on the original Certificate of Default?

I believe the key in understanding the correspondence of Attorney Fehling dated March 18, 1991, identified as Plaintiffs' Exhibit 78, is to focus on the second sentence of the second paragraph, which reads as follows: "If Joe Solfanelli has not sold his interest in the Cellular Company and paid $300,000 to Meridian Bank by 2:00 P.M. on Friday, March 22, 1991, Meridian Bank will no longer refrain from taking further action."

If that is an accurate statement of the Bank's position, then the converse of that statement must also be true, i.e., if Joe Solfanelli *has* sold his interest in the cellular company and paid $300,000.00 to Meridian Bank by 2:00 o'clock PM on Friday, March 22, 1991, Meridian Bank will *continue to* refrain from taking further action.

Section 90 of the Restatement (Second) of Contracts, reads, in part, as follows:

A promise which the promisor should reasonably expect to induce action or for-bearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Restatement (Second) of Contracts § 90(1) (1981).

Solfanelli sold the cellular company by the 22nd of March, 1991. He would have had little motive to sell the stock unless continued forbearance was understood as a result of that sale.

We have an additional reason why the Certificate of Default of March 18, 1991 should be deemed cured.

To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Restatement (Second) of Contracts § 229 (1981).

When an obligee has acquiesced in an obligor's failure strictly to adhere to a timetable of payment or performance, courts often are inhospitable to the obligee's sudden invocation of forfeiture provisions.

Restatement (Second) of Contracts § 229 cmt. c (1981).

I am satisfied that the combination of these circumstances compel the conclusion that the default declared on March 18, 1991 was, in fact, cured four (4) days later when the sale of the cellular company took place.

Notwithstanding that conclusion, however, it was shortly thereafter, by letter of March 28, 1991, when Attorney Fehling identified two other areas of default as remaining "due and owing to Meridian Bank by Joe and Natalie Solfanelli: (1) Mortgages. (2) Sections A and C of the financial statement submitted in January." (Plaintiffs' Exhibit 83.) The testimony, or more accurately, the lack of testimony relative to the details of the default mentioned in this letter cannot support a finding that these purported deficiencies were sufficient to enable the remedies set forth in Paragraph 12 of the Stipulation.

Regardless of what transpired earlier, on October 25, 1991, Attorney Fehling wrote to counsel for the Debtors and notified him that "[A]dditional, serious default of the terms of the Stipulation [exists] in that the '10–Day Average Price' fell to more than four points below the 'Reference Price' [set by the Stipulation]. This constitutes a default under Paragraph 11(d)(2) of the Stipulation and Security Agreement." (Plaintiffs' Exhibit 85.)

This declaration of default went unchallenged at the trial and unequivocally indicates that Solfanelli was in default as of October 25, 1991. (Plaintiffs' Exhibit 86.) Moreover, on November 22, 1991, pursuant to defaults in paragraphs 11(d)(1) and 11(d)(2), Meridian Bank terminated the Stipulation and Security Agreement presumably under the terms of paragraph 2 of the Stipulation and Security Agreement. (Plaintiffs' Exhibit 86.)

The court is satisfied that the forbearance alluded to by Attorney Fehling in his correspondence of March 18, 1991 had the effect of delaying the effective date of the Certificate of Default of March 18, 1991 until October 25, 1991, when all remedies of the Bank kicked in.

This conclusion does not change the fact that, on March 18, 1991, at the time of filing the Certificate of Default, the Plaintiffs were in technical default, not having liquidated the cellular phone interest.

### (2) Refusal to Withdraw Judgment

The Plaintiffs further complain of the Bank that it failed to withdraw the judgment against Natalie Solfanelli and also neglected to consent to the dismissal of Mrs. Solfanelli's Chapter 11.

Our record is sufficient to establish that all conditions required of Natalie Solfanelli were met and the judgment against her should have been lifted pursuant to paragraph 18 of the Stipulation and Security Agreement.

This conclusion is based on the testimony of Mrs. Solfanelli and Mr. Fehling, as well as a review of Plaintiffs' Exhibits 108 and 109. I am satisfied that all prerequisites material to the release of Natalie Solfanelli were satisfied by the documents included in the letter of Joseph Solfanelli dated April 3, 1991 and identified as Plaintiffs' Exhibit 108.

While the Stipulation does not discuss the "dismissal" of the case, there is sufficient evidence to conclude that the Stipulation and Security Agreement was, in fact, breached by the refusal of Meridian to release Mrs. Solfanelli from the judgment as it promised. See Restatement (Second) of Contracts § 235(2) (1981).

### (3) Garnishment of Post–Petition Earnings and (4) Garnishment as Causing Injury to Natalie Solfanelli

The garnishment of the post-petition funds was not a matter addressed by the Stipulation.

The court views it as a negligent act not necessarily breaching the terms of an agreement which did not address the Bank's rights in these funds. While this improper garnishment generated a cause of action in favor of Natalie Solfanelli, it does not appear to represent a breach of the parties' Stipulation.

The relief requested in Count IV of the Amended Complaint asks that this court declare the Release of Meridian Bank from the Solfanelli's, attached to the Stipulation, be declared void by reason of the Bank's breach of certain terms. Since I find that a breach did in fact occur by reason of the Bank's refusal to withdraw the judgment, the impact of that breach must be discussed in this opinion.

Paragraphs 25 and 26 of the Plaintiffs' Amended Complaint read as follows:

25. By the defendant, Meridian Bank's actions as described above, the defendant, Meridian Bank, has materially breached its obligations under the Stipulation and Security Agreement, which constitute constructive conditions to the Plaintiffs' obligations under the Stipulation and Security Agreement.

26. The Plaintiffs' Release of the Bank attached as Exhibit A to the Stipulation and Security Agreement is, therefore, void under the doctrine of failure of considerations.

While the phrase "failure of consideration" is a term retained by the Uniform Commer-

cial Code (13 Pa.C.S.A. § 3408), it is referred to in the Restatement of Contracts as "failure of performance" to avoid confusion with the "want" or absence of consideration. Restatement (Second) of Contracts § 237 cmt. a (1981).

 "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). "Where the consideration given by each party to a contract consists in whole or in part of promises, all the performances to be rendered by each party taken collectively are treated as performances to be exchanged under an exchange of promises, unless a contrary intention is clearly manifested." Restatement (Second) of Contracts § 232 (1981).

Paragraph 10 of the Stipulation reads as follows:

> 10. *Debtors' Release of Bank.* For and in consideration of Bank's entering into this Stipulation generally, Bank's agreement to allow the use of Cash Collateral, and Bank's forbearance as described in this Stipulation, Debtors shall execute and deliver a release in the form attached hereto as Exhibit "A" (the "Release"). *The Release shall survive termination of this Stipulation and shall retain its full force and effect, regardless of what transpires in the future between Debtors and Bank, as to all matters, causes, and things whatsoever from the beginning of the world to the date of this Stipulation.* (Emphasis ours.)

Consistent with this language, paragraph 8 of the Release attached to the Stipulation recites:

> 8. This Release shall survive termination of the Cash Collateral Stipulation and shall retain its full force and effect, regardless of what transpires in the future between Releasors and Releasees, as to all matters, causes, and things whatsoever from the beginning of the world.

 Unequivocally, the parties have "manifested" an intention to release Meridian Bank independent of the Stipulation. While Mrs. Solfanelli may have had a claim against Meridian for damages for breaching its agreement to release her from the judgment, Mrs. Solfanelli is still bound by the terms of the Release attached to the Stipulation. *See* Restatement (Second) of Contracts § 232 cmt. a, illus. 3 (1981). Of course, Pennsylvania law would strictly construe the Release so as to not bar the enforcement of a claim not accrued as of the date of the release. *Vaughn v. Didizian,* 436 Pa.Super. 436, 648 A.2d 38, 40 (1994).

### Count VII—*Violation of 9504 of the Uniform Commercial Code and Rule 10(b) of the Securities Exchange Act of 1934 as amended*

 While the purported violations of the automatic stay and of the Stipulation are critical events for the Plaintiffs, of larger economic significance was the alleged deficiencies in the process by which the shares were liquidated.

### *Violation of § 9504 of the Uniform Commercial Code* (Commercial reasonableness)

Count VII of the Complaint argues that the Bank did not dispose of the First Eastern Bank stock in a commercially reasonable manner as required by 13 Pa.C.S.A. § 9504(c). The Debtors' interest in securities amounted to approximately 2.5% of all outstanding First Eastern Bank stock. (Transcript of 01/11/95 at 180.) While the male Debtor acknowledges never requesting that the shares be marketed, he advances that it was unreasonable for the Bank to "sit" on this stock for a period of 11 months, i.e., from March 18, 1991, when the Bank first declared a default, until February, 1992, when the stock was sold. Solfanelli further submits that the volatility of the First Eastern Bank stock was such that it should have been sold at those points in time when its price allowed the debt to be substantially paid.

It is undisputed that the Bank filed its Certificate of Default on March 18, 1991. From that point forward, the Bank, more or less, asserted full control over its liquidation pursuant to provisions of the Uniform Commercial Code.

Nevertheless, 13 Pa.C.S.A. § 9207(a) reads as follows:

A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

Notwithstanding this provision, several courts have held that this section does not impose upon a pledgee the duty to preserve the market value of stock. *Northern Trust Co. v. Burlew*, 171 Ill.App.3d 1000, 1003, 525 N.E.2d 1123, 1126, 121 Ill.Dec. 816, 819, *appeal denied*, 123 Ill.2d 560, 535 N.E.2d 403, 128 Ill.Dec. 892 (1988). *Capos v. Mid America National Bank*, 581 F.2d 676 (7th Cir. 1978).

■ "[A] pledgee is not liable for a decline in the value of pledged instruments." *Citibank, N.A. v. Data Lease Financial Corp.* 828 F.2d 686, 694 n. 11 (11th Cir.1987), *cert. denied*, 484 U.S. 1062, 108 S.Ct. 1019, 98 L.Ed.2d 985 (1988). *Tepper v. Chase Manhattan Bank, N.A.*, 376 So.2d 35 (Fla.Dist.Ct.App.1979). *New Jersey Bank v. Toffler*, 139 N.J.Super. 161, 353 A.2d 116 (1976).

■ This is true even if timely action could have prevented such decline. *See* Restatement of Security § 18 cmt. a (1941). "The pledgee does not become an insurer of the value of the pledgor's collateral." *Fidelity Bank & Trust Co. v. Production Metals Corp.*, 366 F.Supp. 613 (E.D.Pa.1973). *In accord, Federal Deposit Insurance Corp. v. Webb*, 464 F.Supp. 520 (E.D.Tenn.1978), (There is no duty to sell stock, absent a reasonable request by the pledgor.)

■ This principle is especially true when the collateral is worth less than the debt. *FDIC v. Blue Rock Shopping Center*, 567 F.Supp. 952 (D.Del.1983). Where the opposite is true, i.e., the collateral exceeds the debt, the pledgee is not free to disregard the wishes of the pledgor because there is no justification for ignoring the pledgor's desire to have the debt paid. *See Fidelity Bank &*

*Trust Co. v. Production Metals Corp.*, 366 F.Supp. 613, 617 (E.D.Pa.1973). By virtue of the covenant of good faith and fair dealing, a duty is imposed on the pledgee "to consent to a sale of pledged property for the purpose of satisfying in full the loans secured by the pledge." *Hutchison v. Southern California First National Bank*, 27 Cal.App.3d 572, 103 Cal.Rptr. 816, 823 (1972).

■ A failure to timely request a sale, however, precludes a finding that the pledgee breached its duty of reasonable care. *FDIC v. Caliendo*, 802 F.Supp. 575, 583 (D.N.H. 1992).

A review of the evidence indicates that there may have been opportunities to have sold the stock for greater than the amount of the debt between March 18, 1991 and the date of the ultimate sale in late February and early March of 1992. (Defendant's Exhibit 78.) Nevertheless, Solfanelli has not been shown to have requested a sale of the stock during this time period.

Moreover, we can find no fault with the process by which the liquidation took place. With First Eastern stock showing erratic fluctuations during the last quarter of 1991 and its financial picture appearing particularly glum, the sale of the stock in early 1992 was appropriate. In addition, the choice of Keefe, Bruyette, and Woods, nationally known marketmakers[2], was also appropriate, as was Meridian's reliance on Keefe, Bruyette, and Woods' methodology for ultimate liquidation.

Up to this point, we have no difficulty concluding that the disposition of the stock was in accordance with the Uniform Commercial Code and was performed in a commercially reasonable manner.

On February 18, 1992, the largest block of the stock held by Meridian bank was sold on the recommendation of Keefe, Bruyette, and Woods that it had a "buyer" for the shares.

While the sale of the 136,598 shares occurred at $10¼ per share, it was noted by Bank officials that First Eastern Bank stock

---

**2.** Although the definition of a marketmaker was rather vague, it appears that such an entity is committed to buying stock at the "bid" price and selling stock at the "ask" price. (Deposition of Joseph Berry, page 72, Plaintiffs' Exhibit 103.)

traded at $13 per share on February 20, 1992. (Plaintiff's Exhibit 22 & 34.) A Bank investigation into this sale revealed that the stock was purchased by none other than Keefe, Bruyette, and Woods on February 18 at $10¼ per share and sold by them on February 20th for $13 per share.

Upon learning these facts, the Bank began discussions with Keefe, Bruyette, and Woods over the potential losses suffered by the Bank by reason of these facts. These negotiations culminated in a settlement occurring on March 24, 1992 whereby Keefe, Bruyette, and Woods would pay Meridian $150,000 in return for a Release and Indemnification Agreement. (Plaintiffs' Exhibit 22.)

This entire episode occurred without the knowledge of Joseph Solfanelli.

13 Pa.C.S.A. § 9504(c) is unequivocal that "[E]very aspect of the disposition [of collateral] including the method, manner, time, place and terms must be commercially reasonable." With the Debtors being liable for the deficiency under 13 Pa.C.S.A. § 9504(b), it is reasonable to assume that the potential claim against Keefe, Bruyette, and Woods for "flipping" the shares was an integral part of the "disposition" of the collateral. In fact, Meridian apparently thought that it was so entwined with the sale that they treated it in their own documents as a "sale of additional securities." (Plaintiffs' Exhibit 34.)

Furthermore, "Every contract or duty . . . [under the Uniform Commercial Code] . . . imposes an obligation of good faith in its performance or enforcement." 13 Pa.C.S.A. § 1203. Good faith is defined as "Honesty in fact in the conduct or transaction concerned." 13 Pa.C.S.A. § 1201.

With the knowledge that the eventual sale price would play a precipitous role in his family's financial future, Joseph Solfanelli wrote to the Bank on March 24, 1992 and asked them for a "detailed schedule as to the calculations of this balance." (Plaintiffs' Exhibit 33.) The Bank responded with Plaintiffs' Exhibit 34, which blatantly and falsely stated that the last credit to the account was for $150,000 as a result of the "sale of additional First Eastern stock." The existing loan balance was calculated at $1,191,495.33.

The reasons are not obvious why the Bank was not inclined to forthrightly acknowledge that they were able to negotiate a settlement with Keefe, Bruyette, and Woods for what the Bank thought was an impropriety. Nevertheless, because it impacted not only Solfanelli but the entire bankruptcy estate, the true nature of this transaction should have been disclosed to the Debtors.

 Although the courts have struggled to fashion an objective standard as to when the duty of good faith has been breached, there can be no dispute that intentional misstatements cannot qualify as "honesty in fact." Nonetheless, this breach of the obligation of good faith cannot be used to support an independent cause of action. See Uniform Commercial Code (U.L.A.) PEB Commentary No. 10, Section 1–203, at p. 91, dated February 10, 1994 [Appendix II at end of Volume 3B] (1992).

> The correct perspective on the meaning of good faith performance and enforcement is the Agreement of the parties. The critical question is, "Has 'X' acted in good faith with respect to the performance or enforcement of some right or duty under the terms of the Agreement?" It is therefore wrong to conclude that as long as the agreement allows a party to do something, it is under all terms and conditions permissible. Such a conclusion overlooks completely the distinction between merely performing or enforcing a right or duty under an agreement on the one hand and, on the other hand, doing so in a way that recognizes that the agreement should be interpreted in a manner consistent with the reasonable expectations of the parties in the light of the commercial conditions existing in the context under scrutiny. The latter is the correct approach. *Id.*

I am satisfied that resolving a claim against Keefe, Bruyette, and Woods without consulting the beneficial owner of the stock violated the reasonable expectations of the parties. I am equally certain that falsely claiming that these proceeds were received as a result of the sale of additional stock aggravated the initial impropriety and confirms to me that the disposition of the collat-

eral was not performed in a commercially reasonable manner.

There lies another reason which supports the conclusion that this disposition was not commercially reasonable. 13 Pa.C.S.A. § 9504(c) generally requires notice to the debtor of the sale of collateral. One of the four exceptions to that rule applies to collateral "of a type customarily sold on a recognized market. . . ."

The reason behind the third exception is that the price determining function of the market should guarantee a fair price with collateral regularly sold on that market so that the debtor need not worry that the secured party will get a fair price for the collateral. (Citation omitted). Thus, if the collateral is stock traded on the New York Stock Exchange or grain on the Chicago Mercantile Exchange, where supply and demand accurately reflect the price, the secured party need not give reasonable notification to the debtor before sale.

Hawkland, 9 Uniform Commercial Code Series § 9–504:07 at p. 592.

In this case, however, despite the fact that First Eastern Bank stock was publicly traded, the "price determining function of the market" may have failed. Meridian knew that and promptly called to task Keefe, Bruyette, and Woods over their concerns about the inadequacy of price. It was at that moment that the "spirit" of § 9504 should have motivated the Bank to contact the Debtors.

The issue now becomes what the appropriate remedy for the Bank's behavior should be.

The Uniform Commercial Code Comment to 13 Pa.C.S.A. § 1203 suggests "[T]hat a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power." The most obvious remedial right that exists after a post-liquidation impropriety is the power to seek a deficiency.

█ Most courts that have examined the penalty for a creditor failing to sell its collateral in a commercially reasonable manner have concluded that the value of the collateral will be presumed to equal the indebtedness, thus preventing a deficiency claim. The majority of those courts, however, have held that the presumption is a rebuttable one. Joseph P. Cook, *The Secured Party's Right to a Deficiency Judgment After Violating Uniform Commercial Code Section 9–504(3): A Tabular Approach*, 49 Consumer Fin.L.Q.Rep. 242, 244 (1995). Pennsylvania has accepted that view and allowed the creditor an opportunity to tender contrary evidence. *Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 78, 468 A.2d 465, 467 (1983). *See also, United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1306 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

█ While Meridian offered no direct evidence that the settlement with Keefe, Bruyette, and Woods was a reasonable one, I cannot ignore the fact that I have considered the Bank's actions up to the point of negotiating with Keefe, Bruyette, and Woods as being commercially sound. The failure of the Bank existed in the refusal to disclose their suspicions of improprieties to the equitable owner of the stock, Joseph Solfanelli, their neglect in declining to include Solfanelli in their settlement discussions, and their subterfuge in trying to hide this event from the Debtors. While I can speculate what the stock may have sold for during this time period [3], I have been given no evidence whatsoever of the scope of potential damages—, compensatory, consequential, or punitive— that the Plaintiffs may have against Keefe, Bruyette, and Woods. I therefore conclude that the commercially unreasonable manner in which the claim was resolved will require my finding that the stock value equals the indebtedness.

### Rule 10b of the Securities Exchange Act of 1934

The Plaintiffs allege that the transfer of the First Eastern Bank stock through Keefe, Bruyette, and Woods were under such cir-

---

**3.** First Eastern Bank stock prices were made a part of the record. (Defendant's Exhibit 78.)

cumstances as to entitle them to damages under the Securities Exchange Act of 1934.

█ The Solfanellis maintain that the sale of the stock was fraught with improprieties such as the failure of notice and the unreasonable nature of the sale.

The Bank argues vehemently that the Solfanellis have no standing under the Securities Exchange Act of 1934 in that they are neither sellers nor purchasers. It relies on *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (Securities Act of 1933) and *Weaver v. Marine Bank*, 637 F.2d 157, 163 (3rd Cir.1981) (Securities Exchange Act of 1934) for the proposition that a pledge is an "offer or sale." Therefore, it deduces, if the pledge of the stock by Joseph Solfanelli to Meridian Bank is a "sale," then Solfanelli could not have sold the stock again when the Bank liquidated it through Keefe, Bruyette, and Woods.

[24] This reasoning is innovative, but fallacious. The provisions of the Securities Exchange Act of 1934 are to be interpreted with great flexibility consistent with the history and remedial purposes envisioned by Congress. *Madison Consultants v. FDIC*, 710 F.2d 57, 61 (2d Cir.1983). *Rubin v. U.S.* did not suggest that pledges were the "equivalent" of sales under the Securities Act of 1933. Rather, the Supreme Court concluded that a transfer of a partial interest of title to stock can support a claim under § 17(a). 15 U.S.C. § 77q(a). This is so because the language of the Act governs any disposition of an "interest in a security." 15 U.S.C. § 77(b)(3). Accordingly, the Supreme Court concluded that pledges are covered by the Act even though it represents "less than absolute title." *Rubin v. U.S., supra.,* at 429, 101 S.Ct. at 701.

Moreover, it would be absurd to suggest that an entity could immunize its further dealings with a stock from securities fraud legislation by initially parting with only partial interest in it.

This court therefore concludes that the provisions of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)) are available to Joseph Solfanelli in this litigation, since he still maintained a beneficial interest in the block of First Eastern Bank shares. Meridian acknowledged as much when they credited Solfanelli's account with the proceeds of the Keefe, Bruyette, and Woods post-sale settlement.

█ Having so found, we now turn to Section 10(b) of the Securities Exchange Act of 1934 which prohibits deceptive conduct in connection with the purchase or sale of any security. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

§ 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891, 15 U.S.C. § 78j.

This was expounded upon by Rule 10b–5, which provides as follows:

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any

person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5

To state a claim under Rule 10b–5, the plaintiff must allege that the defendant

(1) with scienter—an intent to deceive, manipulate, or defraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–214, 96 S.Ct. 1375, 1381–91, 47 L.Ed.2d 668 (1976),

(2) made misleading statements or omissions, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 7–8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985),

(3) of material fact, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976),

(4) upon which the plaintiff—a purchaser or seller of the security, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–55, 95 S.Ct. 1917, 1923–35, 44 L.Ed.2d 539 (1975),

(5) relied in entering the transaction, *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), and

(6) which caused economic loss to the plaintiff. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–86 (7th Cir.1990). *Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir.1991).

Based on the evidence presented at the time of trial, including Plaintiffs' Exhibit 34, this court is satisfied that the Plaintiffs have established certain elements of this cause of action.

Exhibit 34 was a letter from Meridian Bank to Joseph Solfanelli dated April 1, 1992, explaining the credits that were entered on the Solfanelli debt. This letter was sent to Solfanelli at his written request. (Plaintiffs' Exhibit 33.) It unequivocally identifies a credit of $150,000 on March 26, 1992 as arising from the "proceeds from sale of additional First Eastern stock." As was established at the time of trial, this credit actually arose

as a settlement of a claim between Meridian Bank and Keefe, Bruyette, and Woods. This settlement was not disclosed to Solfanelli either upon its occurrence or even in the April 1 response letter.

As discussed earlier, Solfanelli was a "seller" of stock. The Bank is found to have intended to deceive Solfanelli by making a misleading statement. We consider that statement material since, at the very least, it involved a settlement of a claim that the Debtor-in-Possession, Joseph Solfanelli, maintained an interest in under the broad provisions of 11 U.S.C. § 541. If that was not significant enough, such a settlement could be construed to be subject to court approval under the provisions of Federal Rule of Bankruptcy Procedure 9019.

Notwithstanding these findings, however, the Plaintiffs have failed to demonstrate how Solfanelli *relied* on this false statement or how it may have caused him any economic loss. These are essential elements of a cause of action under Rule 10b–5 without which that claim must fail.

In discussing this further, I wish to differentiate the failure to disclose and the misrepresentation made by the Bank from the potential improprieties of Keefe, Bruyette, and Woods. The Bank's failings did not affect the price of the stock, nor did it affect the market in which the stock was traded. These are important considerations when the Plaintiff's cause of action under the Securities Exchange Act of 1934 is evaluated. The purpose of the securities legislation is to discourage "sharp, ethically-suspect, and fraudulent business practices." *Harnett v. Ryan Homes, Inc.*, 496 F.2d 832, 836 (3rd Cir.1974). We cannot ignore the linkage that should exist between the misrepresentation (or failure to disclose) and the price paid, received, or the decision to market. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988). Even if we were to measure reliance by the inability of Solfanelli to avail himself of an injunctive remedy [4], the Defendant Bank had already sold the shares prior to its wrongdoing. Whether Solfanelli has a 10(b) claim

---

4. *See Madison Consultants v. Federal Deposit Ins.* *Corp.*, 710 F.2d 57, 62 (2d Cir.1983).

against Keefe, Bruyette, and Woods is not before me.

Furthermore, just as the Defendant had failed to establish how its conduct did not impair the value of the disposition of the collateral under the Uniform Commercial Code, as discussed earlier, Solfanelli has failed to carry his burden of establishing "economic loss." "The misrepresentations must touch upon the reasons for the investment's decline in value." *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989). We have been given no nexus.

I, therefore, conclude that the Plaintiffs cannot prevail on their claim under Rule 10b–5.

In summary, Natalie Solfanelli, Co–Plaintiff, has prevailed on Counts I, II, and III, but not on Count IV. Joseph Solfanelli, Co–Plaintiff, has prevailed on Count VII.

This Opinion is issued in support of Order dated December 10, 1996. The further disposition of Counts V and VI has been scheduled in that Order.

The time to file motions for reconsideration and/or appeals shall run from the date of this Opinion.

### *ORDER*

On Count I, judgment is hereby entered in favor of the Plaintiff, Natalie G. Solfanelli, and against the Defendant, Meridian Bank, in the amount of One Dollar ($1.00).

On Count II, judgment is hereby entered in favor of the Plaintiff, Natalie G. Solfanelli, and against the Defendant, Meridian Bank.

On Count III, judgment is hereby entered in favor of the Plaintiff, Natalie G. Solfanelli, and against the Defendant, Meridian Bank, in the amount of Ten Thousand Dollars ($10,-000.00).

Plaintiff's counsel(s) is directed to file an itemization of attorneys' fees within thirty (30) days and the Defendant has ten (10) days thereafter to request a hearing on those fees.

On Count IV, judgment is hereby entered in favor of the Defendant, Meridian Bank, and against the Plaintiff, Natalie G. Solfanelli.

On Count VII, judgment is hereby entered in favor of the Plaintiff, Joseph R. Solfanelli, and against the Defendant, Meridian Bank. The obligation of Joseph R. Solfanelli to Meridian Bank is hereby deemed satisfied.

A telephonic conference on Counts V and VI is hereby scheduled for *Friday, January 31, 1997* at *10:30* o'clock A.M. and will be arranged by the Plaintiffs.

An Opinion in support of this Order will follow.